R. B. SIMPSON AS TRUSTEE IN BANKRUPTCY OF JAMES C.
    WATSON SURVIVING PARTNER OF HOOTON & WATSON, A
    COPARTNERSHIP COMPOSED OF J. J. HOOTON, (deceased)
    AND JAMES C. WATSON, Appellant, v. THE FIRST NATION-
    AL BANK OF PENSACOLA, W. H. MILTON RECEIVER OF
    THE FIRST NATIONAL BANK OF PENSACOLA, AND W. K.
    HYER, Appellees.

Opinion filed December 19, 1917.

The findings on the facts where the evidence is taken before a
    Special Master should not be disturbed by an appellate court
    unless such findings are clearly shown to have been erron-
    eous.

Appeal from Court of Record for Escambia County,
Kirke Monroe, Judge.

Decree affirmed.

F. W. Marsh and B. R. Coleman, for Appellant;

Watson & Pasco, for Appellees.

ELLIS, J.— J. J. Hooton and James C. Watson co-partners as Hooton & Watson brought suit in the Court of Record of Escambia County against the First National Bank, W. H. Milton Receiver of the First National Bank, F. E. Brawner and W. K. Hyer. During the progress of the cause J. J. Hooton, one of the complainants, died, and James C. Watson was adjudged a bankrupt. Upon suggestion of the death of Hooton and the bankruptcy of Watson the judge of the court ordered that the cause proceed to final decree in the names of James C. Watson as surviving partner of Hooton & Watson, and R. B. Simpson as Trustee in Bankruptcy of James C. Watson.

According to the allegations of the bill of complaint Hooton & Watson in January, 1913, bought from F. E. Brawner as the agent of the First National Bank and William K. Hyer one hundred shares of the capital stock of the Pensacola State Bank belonging to Hyer, agreeing to pay therefor ten thousand dollars. Hooton & Watson executed their four promissory notes each for twenty-five hundred dollars payable to the order of F. E. Brawner, in two, twelve, eighteen and twenty-four months respectively. The first note bore interest at eight per centum per annum, and the others at six per centum per annum. The bank stock was transferred by Hyer to Hooton & Watson and the certificates numbered 212, 213 and 214, were attached to the three notes maturing in twelve, eighteen and twenty-four months as collateral security. That the last three notes and the certificates of stock were transferred and delivered by Brawner to the First National Bank; and the first note, Brawner, as the First National Bank's Agent, discounted with the Citizens & Peoples National Bank and turned the proceeds thereof over to the First National Bank. Hooton & Watson paid the first note

with interest to the Citizens & Peoples Bank at maturity, and on July 17, 1913, paid to the First National Bank the semi-annual interest due on the remaining three notes, and on January 17, 1914, they paid to R. W. Goodhard, Receiver of the First National Bank, the second note and semi-annual interest due on the three.    It is alleged that on the fifth day of December ,1913, The Pensacola State Bank suspended payment and Receivers were appointed to liquidate and wind up the affairs of the bank.    The bill alleges that when Brawner made the sale of the stock in the Pensacola State Bank to Hooton & Watson, Brawner as agent for Hyer and the First National Bank represented that he, Brawner, was President of the Pensacola State Bank, and as such was fully acquainted with its financial condition; that the bank was solvent, in good financial condition and making money, and that an examination of the bank's affairs showed that its assets exceeded its liabilities to such an amount as to make its capital stock worth one hundred and twenty dollars per share, and that the Hyer stock was worth more than one hundred and ten dollars per share.

These representations it is alleged were untrue, and that the Pensacola State Bank at the time was insolvent and continued so until its failure; that its condition was known to Brawner and the First National Bank, and unknown to Hooton & Watson, who relied upon the representation made by Brawner.    It is alleged that the Hyer stock in the Pensacola State Bank at the time of the sale to Hooton & Watson was held by the First National Bank as collateral security, or as a pledge for the payment of an indebtedness due by Hyer to the bank; that the First National Bank and Hyer employed and authorized Brawner to sell the stock.    It is alleged that the First National

Bank during the years 1909, 1910 and 1911, by the use of its own funds purchased a controlling interest in the stock of the Pensacola State Bank and certificates were issued therefor in the name of W. A. Blount, Jr., who executed to the First National Bank a note for the purchase price, and delivered it with the certificates of stock to the bank upon an understanding that the bank was the equitable owner. That these facts became known to a National Bank Examiner, who required the "transaction to be modified," which requirement resulted in the transfer of the stock held by Blount, Jr., as Trustee, to. parties owning and controlling a majority of the stock of the First National Bank "in the ratio of their ownership of the stock" in the bank. Notes being executed by them to the bank in sums aggregating the amount of the W. A. Blount, Jr., note. Certificates of stock in the Pensacola State Bank were then issued to each purchaser, and the notes and certificates of stock delivered to the First National Bank. That the Hyer stock which was sold to Hooton & Watson constituted part of the stock originally acquired by the National Bank in the manner stated. That the policies and business activities of the Pensacoa State Bank were thereafter conducted by a board of directors chosen and selected by the vote of the stock so held as the equitable property of the First National Bank. It is then alleged that the Pensacola State Bank was wrecked by this management in a series of obviously unprofitable transactions with its own directors who were also directors of the First National Bank. This was the condition of the Pensacola State Bank, a condition of inevitable insolvency, when the sale was made to Hooton & Watson; that the notes of Hooton & Watson were made payable to the order of Brawner at the request of the First National

Bank, and by him transferred to the bank without consideration, the "Bank being the real beneficiary and payee thereof." That in the transaction with Hooton & Watson the First National Bank advised Brawner and was cognizant of the price he was to demand for the stock and authorized him to sell it, and was cognizant of all the details of the transaction. That the First National Bank knew that the Pensacola State Bank was insolvent, that its assets had been dissipated and that the stock was of no value, and that Hooton & Watson had been induced by Brawner to make the purchase. That the First National Bank had become insolvent and W. H. Milton had been appointed receiver. That Hooton & Watson had offered to return the stock to Hyer, which offer. was declined. That the first note was paid by Hooton & Watson without knowledge of the facts above recited, and that they paid the second note in the belief that the First National Bank held the same in due course for value. That Hyer was insolvent; that the First National Bank knew of his insolvency when the sale of the Hyer stock was made, and that the stock was sold because a National Bank Examiner objected to the character of the loan and the collateral, and in an effort of the First National Bank to better its condition. It is claimed by Hooton & Watson that the notes given by them for the stock are voidable because of the fraud perpetrated by the First National Bank, Hyer and Brawner, and that Hooton & Watson are entitled to have the notes delivered up for cancellation. Many interrogatories were propounded in the bill which the defendants were required to answer. The bill contained prayers to the effect that the First National Bank and its. receiver be required to surrender the last two notes for cancellation, that it be enjoined from instituting suit

upon them or disposing of them to innocent purchasers; that certificates of stock numbered 213-214 of the capital stock of the Pensacola Bank be surrendered; that the amount paid on the first note and the interest be declared to be a valid claim against the First National Bank and the amount paid on the said note and interest be decreed to be a trust fund in the hands of the receiver and a lien upon the funds held by him prior in dignity to the claims of the general creditors, and that the sum of ten thousand dollars be declared a valid claim against the First National Bank, or so much thereof as complainants shall be required to pay by reason of their apparent ownership of the stock of the Pensacola State Bank from January, 1913, to December 5, 1913, and that a reference of the matter be made to a Master to make a report as to the true amount, and that the same when ascertained shall be decreed to be paid as other claims of general creditors and share in the dividends from the assets of the bank.    As to the defendant William K. Hyer the bill prayed that the sale of the stock be declared to be void, and for an accounting as to whatever sums the complainants may be required to pay on account of their apparent ownership of the said stock, and on account of the notes held by the other defendants, and on account of the purchase price of the stock, and that complainants have a decree for the amounts so found to be due to be satisfied from either the assets of the First National Bank if found entitled thereto, or from the assets of Hyer as the complainants may elect.    There was a prayer for general relief and for subpoenas.

·    The First National Bank answered the bill of complaint incorporating therein a general demurrer for want of equity.    The answer denied the material allegations of

the bill so far as they charged the bank with ownership of the W. K. Hyer certificates of stock, or Brawner's agency, or the Bank's knowledge of the financial condition of the Pensacola State Bank in 1913, or complicity in the financial wrecking of that institution.     As to the W. K. Hyer stock the answer averred that it was held by the bank as collateral security for the payment of a note for twenty-two thousand dollars made by a person other than W. K. Hyer, named Knowles Hyer, and that the notes made by Hooton & Watson to Brawner in payment for the Hyer stock were transferred to the First National Bank to be applied on the debt of this third person who owed a large sum of money to the bank, to secure which it held a large amount of collateral security, and the Hooton & Watson notes were applied as a payment upon the said indebtedness.     The answer denied that the bank was the real beneficiary or payee of the notes, but averred that the notes went to discharge an obligation of W. K. Hyer to a debtor of the bank, and to discharge the latter's debt to the bank.     That Brawner in bringing the sale acted in his own interest and indirectly in the interest of W. K. Hyer, and denied that at the time of the sale the Pensacola State Bank was insolvent, or in danger of insolvency.     The answer avers that from the fall of 1910 to the present time no person was simultaneously an officer of the First National Bank and of the Pensacola State Bank, and denied that the National Bank had any interest whatever in any stock of the Pensacola State Bank at any time after the fall of 1910, or prior thereto.     All the interrogatories were answered except the last two which the bank declined to answer because they did not seek to elicit any information that tended to prove the agency of Brawner, or that was germane to any theory

35—Vol. 74

upon which the complainants sought the relief for which they prayed.

F. E. Brawner answered the bill of complainant denying its material allegations, and particularly his agency either of the First National Bank in the sale of the Hyer stock, or of W. K. Hyer, and denied that as agent for either he made any representations to Hooton & Watson as to the solvency of the Pensacola State Bank. The answer avers that when the sale of the Hyer stock was made the said bank was solvent, that its books showed its stock to be above par, and that Brawner believed the bank was in a sound financial condition, and required strict proof that the bank was insolvent in January, 1913. The answer averred that at the time of the sale to Hyer the defendant Brawner himself became the purchaser of a large amount of the capital stock of the Pensacola State Bank at the price of $110.00 per share, and which he believed to be a fair value for the stock. A general demurrer to the bill for want of equity was included in this answer.

Upon replication filed by the complainants, a special master was appointed to take the testimony.

On the 17th day of February, 1916, the cause came on for final hearing on bill, answers, replication and proofs, and the Chancellor dismissed the bill of complaint at the costs of complainants. From that decree this appeal is taken.

The evidence shows that up to the spring of 1911, W. K. Hyer was President of the First National Bank, and had occupied that position for several years. While he was president of that bank, and during the year 1909 he pur-chased for the bank a controlling amount of the stock of the Pensacola State Bank. The matter was discussed by the Board of Directors, but seems not to have been

made a matter of record in the minutes of the Board. The price paid for the stock was one hundred and forty dollars per share, or forty per cent premium, which it seems was regarded as a fair value. Under the new control Mr. W. A. Blount, Jr., became President of the Pensacola State Bank. Sometime after this transaction and during the fall of 1910, a National Bank Examiner inquiring into the affairs of the First National Bank criticised certain accounts carried by the bank in which the President, W. K. Hyer, was personally interested. This bank examiner required the First National Bank to reduce the indebtedness represented by those amounts. This request was complied with by transferring the accounts to the State Bank. When that bank failed in 1913, some of these accounts, if not all of them, were unpaid, and the indebtedness represented but slightly reduced. The bank examiner also criticised the transaction in which the First National Bank acquired the controlling amount of the State Bank stock. This objection was met by transferring the stock to "one or two others (who) purchased it for the bank—it was to be owned by the bank." Those who acquired this stock were W., S. Keyser, Knowles Hyer, W. K. Hyer, W. A. Blount and W. A. Blount, Jr., all of whom except W. A. Blount, Jr., were directors of the First National Bank. At that time the McDavid-Hyer Company, in which W. K. Hyer was interested, J. W. Hyer, Henry Hyer and W. K. Hyer were largely indebted to the First National Bank, and these accounts were among those which the bank examiner criticised and required that they be reduced, and which later were found in the "debris" of the State Bank. There is, however, nothing which we have discovered in the evidence, to clearly show that in any of these transactions the participants were conscious

of any dishonest motive or lack of business integrity. Mr. W. K. Hyer it seems thought he was perfectly solvent, and that the McDavid-Hyer Company was solvent. It seems that the wealth of these men and the corporations in which they were interested consisted of property the value of which for some reason or another greatly depreciated so that it could not produce the money which the owners had been led to believe it was worth when occasion required the liquidation of assets. F. E. Brawner and associates became the purchasers of the stock in the Pensacola State Bank held in the name of W. A. Blount. This transaction occurred in the fall of 1912. William H. Knowles, a Vice-President of the National Bank, brought about the sale. The stock was sold for one hundred and ten dollars per share, or about thirty dollars per share less than the National Bank had paid for it about two years before. This circumstance, however, cannot be regarded as clearly showing that the directors of the National Bank knew that the State Bank was in a failing condition. It is perfectly reasonable to say that the directors of the National Bank were informed as to the financial affairs of the State Bank, but it cannot reasonably be said that because the stock was sold for less than it cost, when the selling price was above par, that the seller and those associated with him, as directors of the National Bank believed that the State Bank was insolvent. F. E. Brawner, who was the purchaser, knew about the affairs of the State Bank, he had been connected with it as stockholder and director since 1908. In 1912 under the presidency of W. A. Blount, Jr., the bank, according to the testimony of Brawner, "was not making any money," and the stockholders wanted a new president. W. H. Knowles, President of the National Bank, it seems, induced Brawner

to become President of the State Bank.    This would indi-
cate that Knowles and those with whom he was associated
as officers of the National Bank were interested in secur-
ing an officer for the State Bank who could so direct its
affairs as to make it a paying institution. · We may not
infer from this transaction that they merely used Brawner
as an instrument with which to perpetrate a fraud upon
the stockholders  of the State Bank.    It  is  true  that ·
Brawner  had  great   confidence   in   the   judgment and
integrity of Knowles.    It is apparent  from  Brawners'
testimony, and it may be possible  that  Knowles  did, in
be'half of the National Bank and his fellow directors of
that institution, abuse   the confidence and  friendship of
Brawner and take advantage of the latter's faith in him
and lack of business judgment to "unload" upon him and
his associates a large amount  of the capital  stock of the
State Bank, but the judge who tried this case has found
otherwise, and we cannot   say that   the evidence clearly
shows that his conclusion was wrong on this point.    Nor
do we think that Knowles' transactions with Brawner are
conclusive of the point in controversy.    There is evidence
in the record from which one might reasonably infer that
Mr. Knowles and   his associate   directors   of   the First
National Bank were fully informed of the financial affairs ·
of the Pensacola State Bank, knew that the latter institu-
tion was carrying a crushing burden of slow or dormant
assets, not to say worthless paper;   that   they desired, in
view of their knowledge   of the   conditions   existing in
financial circles in Pensacola to dispose of the stock in
the State Bank which had been held by the First National
Bank, but which had been taken.over by the directors of
that institution on   their own   account,   and   that Mr.
Knowles as Vice president of the latter bank in dealing

with his friend Mr. Brawner did not practice that degree of good faith and high integrity that one expects from the presidents of large banks, but we cannot say that the finding of the Chancellor to the contrary was clearly erroneous.      See Carr v. Lesley, 73 Fla. 233, 74 South. Rep. 207.

It appears from the evidence that so far as Brawner was concerned, he acted always in good faith.    He believed as a director of the State Bank that although it was not a paying institution, the fault was in the management, and that in reality the bank was potentially a great money earning institution and needed only an active man such as himself to make it a great success.    He was doubtless assisted to this view of the situation by the representations of his more able friends of the National Bank. Whatever may have been the cause of Mr. Brawner's belief in the State Bank as a sound business enterprise, the fact is that Dave Kugleman and C. A. Fulghum who became interested with Brawner in the purchase of the Blount stock, talked the matter over freely among themselves and concluded without others' aid that it was a good proposition.    Mr. Brawner was interested in associating his friends with him in the control of the State Bank.  After having acquired the Blount stock, which in doing he at the same time increased the value of certain assets held by the bank by securing Mr. Blount's endorsement, he set about to acquire the W. K. Hyer stock.    It also appears that by this time Brawner became better acquainted with the bank's affairs.    He knew more about the different accounts and loans, as to some of which doubtless he became suspicious, but it does not appear that he believed the bank to be in a failing condition; on the other hand he seemed to think its affairs were by no means bad.    It

was not until October or November, 1913, apparently, that Mr. Brawner realized the true situation. The bank could not furnish the bond for the city deposits, which would in consequence be withdrawn, and the bank could no realize in a short time upon the large loans to McDavid-Hyer Company; Andalusia Light & Water Company; Pensacola Lumber Company; Blount Construction Company; Brawner-Riera Company; W. A. Blount, Jr.; J. W. Hyer and others, to pay the city. It appears that the sale of the Hyer stock to Hooton & Watson was a part of the plan to place Brawner and his friends in control of the State Bank. Again, Mr. W. H. Knowles seems to have been active in behalf of his friends and the National Bank. The proceeds of the sale went to the First National Bank towards discharging the obligation of Knowles Hyer to secure the payment of which the stock had been placed as security by W. K. Hyer, whose obligations had become undesirable not to say objectionable to the bank, or at least to the bank examiner. It therefore became important to the First National Bank, that the Hyer obligations should be reduced. Mr. Knowles had been receiving daily financial reports from the State Bank during the presidency of W. A. Blount, Jr. These daily financial statements made up and sent to Mr. Knowles of the National Bank doubtless with the consent of W. A. Blount, Jr., whose obligations were also held by that bank, enabled Mr. Knowles to keep closely in touch with the affairs of the State Bank. His banking experience, ability as a financier, and intimate knowledge of men and their affairs at Pensacola enabled him more accurately than others doubtless to estimate at their true value the assets of the State Bank. His activities in the so-called reorganization of that bank

in which he succeeded in the interest of the First National Bank in disposing of a large amount of what he may have known to be doubtful, if not worthless, securities, by unloading some of it upon a friend, and utilizing that friend to place the remainder would seem to justify the conclusion that he was acting solely in the bank's interest when he induced Mr. Brawner to take over the Blount and Hyer stock. The Chancellor however decided the point otherwise, and there is evidence to support his conclusion which should be sustained unless it clearly appears to have been erroneous. See Waterman v. Higgins, 28 Fla. 660, 10 South. Rep. 97; City of Jacksonville v. Huff, 39 Fla. 8, 21 South. Rep. 774; Lucas v. Wade, 43 Fla. 419, 31 South. Rep. 231; Hopkins v. O'Brien, 57 Fla. 444, 49 South. Rep 936; Sarasota Ice, Fish & Power Co. v. Lyle & Co., 58 Fla. 517, 50 South. Rep. 993; Williams v. Bailey, 69 Fla. 225, 67 South. Rep. 877. Brawner was personally interested in the purchase of the Blount stock, but was not interested in the purchase of the Hyer stock; Knowles knew that, but nevertheless he "suggested" to Brawner that he sell it. Knowles wanted Brawner to find a purchaser for the whole amount of the "Hyer-Blount-Keyser stock, known as the syndicate stock." W. K. Hyer seemed not to be anxious to sell, but stated to Brawner that he would sell if the First National Bank forced him to do so. The Blount stock was purchased directly from W. A Blount, but the Hyer stock was purchased through the First National Bank. It is true that Brawner wished to get people interested and connected with the Pensacola State Bank who would help him build up the bank, but it is also true that Knowles was aware of Brawner's ambition and disinterestedness so far as the National Bank was concerned, and utilized him to dispose of securities

which Knowles may have known were of doubtful value. This he did in the interest of the National Bank. Brawner may have had confidence in the Pensacola State Bank and could see nothing but a bright future, and Knowles with his superior knowledge of banking, of men and affairs, doubtless may have had reason to believe that the bank was in reality insolvent; at least that its stock was undesirable, and therefore wished to dispose of it particularly as by that means the indebtedness of some of its patrons and officers could be materially reduced.

The origin of this indebtedness was the purchase by the National Bank of the controlling interest in the State Bank which interest was afterwards upon criticism by the examiner transferred to the officers of the National Bank whose funds were used in loans to such officers to enable them to take it over, and who deposited with the bank the stock as security for the payment of their notes. There is evidence also to the effect that when the Hyer stock was sold, the note of Knowles. Hyer to secure which the stock was held by the bank amounted to about thirty-six thousand dollars, when Hooton & Watson gave their notes for the stock amounting to ten thousand dollars the Knowles Hyer note was credited with the same and a new note taken for twenty-two thousand dollars. In other words the bank apparently stood the loss of four thousand dollars which represented the difference between what it originally paid for the stock and the amount realized from the sale to Hooton & Watson. But we cannot regard this transaction as conclusively showing that Brawner acted as the agent of the First National Bank. His activities were directed solely in the interest of the State Bank and himself. The First National Bank had control if not the ownership of stock which Brawner needed to accomplish

his purpose, *viz*: the control by himself and friends of the State Bank. Every opportunity was afforded them to investigate the affairs of the latter bank. Hooton & Watson accepted Brawner's opinion as to the value of the stock and the character of the bank's assets. It appears from the evidence that Brawner was not alone in his views. Mr. Blount did not appear anxious to sell, and Mr. Hyer said he would not, unless the First National compelled him to do so. The First National Bank had a right to insist that Mr. Hyer reduce his obligations to the bank, although it forced him to sell some of his securities. There is evidence to show that other business men did not regard the accounts carried by the State Bank as worthless. Many of the men who were indebted on their own account and as security for others regarded themselves and were regarded by others in the community as rich men, perfectly solvent and good for their contracts. The fact that the superior business acumen of W. H. Knowles and his intimate knowledge of the business conditions in the community enabled him to read the future more clearly, or to place a more accurate value upon Pensacola State Bank stock does not introduce into the transaction any element of fraud even if the First National Bank was regarded as the principal in the sale of the stock.

We think that the evidence fails to establish any element of fraud either upon the part of W. K. Hyer or The First National Bank in the transaction. It is true that as time wore on and the State Bank became unable to retain the deposits of the city government and was forced to realize upon some of its "paper" in order to meet the withdrawal of the city funds, it was discovered that many of the accounts were not convertible into cash, and sus-

pension became necessary; but we cannot say that the evidence clearly shows that the First National Bank and W. K. Hyer knew that this condition would arise when the sale of the stock took place. We think that the action of the lower court in dismissing the petition should not be disturbed, because we are unable to say that the evidence clearly shows that the court was in error in holding that Brawner's agency of the National Bank, or of W. K. Hyer, was not established; or in holding that no fraud entered into the transaction to vitiate it, or in holding that Hooton & Watson failed to act with the diligence which the law requires upon discovering the facts which they insist constitute the fraud entitling them to a recision of the contract.

The decree is, therefore, affirmed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.