E. W. TRAVIS, MARY BANKS JOINED BY HER HUSBAND, E. L. BANKS, BEN TRAVIS, JOSEPH TRAVIS, HARRIS TRAVIS, GRIFFIN TRAVIS, T. N. TRAVIS, RAEFIELD SCOTT AND CLARENCE SCOTT BY THEIR NEXT FRIEND, BEN TRAVIS, *Appellants,* v. SIM TRAVIS, *Appellee.*

## Opinion Filed March 11, 1921.

1. Mere mental weakness will not authorize a court of equity to set aside a deed if it does not amount to inability to comprehend the effect and nature of the transaction and is unaccompanied by evidence of imposition or undue influence.

2. Where there is conflict in the testimony, but there is evidence to support the finding of the chancellor, the decree will not be reversed unless it clearly appears to be erroneous.

3. The finding of a chancellor on conflicting evidence will not be disturbed by an appellate court where the mind cannot repose with entire confidence and certainty on a conclusion in favor of either party.

4. Every person is presumed to be sane until the contrary appears, and in civil actions the burden of proof of insanity rests upon him who alleges it.

5. It devolves upon him who seeks to avoid a deed on account of insanity of the grantor to establish the fact of insanity by a preponderance of the evidence.

An Appeal from the Circuit Court for Jackson County; C. L. Wilson, Judge.

Affirmed.

*James H. Finch* and *John M. Calhoun,* for Appellants;

*Paul Carter,* for Appellee.

WEST, J.—The object of this suit was to set aside a deed of conveyance to certain land therein described as a cloud upon the title and for partition of the land attempted to be conveyed thereby among the complainants and the defendant.

The complainants are heirs of the grantor and the defendant is also an heir, being a son of the grantor and brother of those of the complainants who are described in the bill as her children.

The grounds of the alleged invalidity of the deed which it is sought by this suit to have declared ineffectual to convey any title to the property described therein to the defendant are stated in the bill as follows: "Complainants show your Honor that the said Mary Travis at the time of the making of said deed, and for a long time prior thereto and thereafter, was very old and feeble-minded and mentally an imbecile and unable to attend to the ordinary affairs of life by reason of her mental condition. She made said deed without any valuable consideration from the said defendant, which conveyed her entire real property, which was worth about six or seven hundred dollars. That she had no other property than this. That said deed is void for the want of a valuable consideration, and void because the deceased Mary Travis

was not of a mental capacity sufficient to attend to the kind of business or to manage her business affairs. That the said Mary Travis at the time of the making of said deed was almost insane, in fact they started to send her to the asylum. But by reason of the fact some of her relatives agreed to take charge of her and look after her personally, thus keeping her away from the asylum."

By answer to the bill defendant denied that the grantor, the ancestor of complainants and defendant, was at the time of the execution of the deed mentally weak and incompetent to make a deed, denied that she was unduly influenced to do so by the defendant, and averred that the consideration paid by him for such deed was the support of the grantor by the defendant during her life and that she was at the time of its execution in all respects competent to make the deed.

Testimony was taken and upon a final hearing a decree was rendered by the chancellor adjudging the deed to be a valid conveyance of the property to the defendant, that such property was therefore not subject to partition, and dismissed the bill. There was no specific finding upon the issue of fact presented, namely, the alleged incapacity of the grantor to make a valid deed.

There are several assignments of error, but the only question presented and argued is whether in view of the evidence the decree should have been for defendant, the contention being that the evidence was sufficient to establish the fact of the mental incompetency of the grantor to make a valid deed at the time of the execution of the conveyance.

This court has held that mere mental weakness will not authorize a court of equity to set aside a deed if it

does not amount to inability to comprehend the effect and nature of the transaction and is not accompanied by evidence of imposition or undue influence. Clarke et al. v. Hartt et al., 56 Fla. 775, 47 South. Rep. 819; Waterman v. Higgins, 28 Fla. 660, 10 South. Rep. 97.

That the grantor in the deed under consideration was subject to what may have been insane delusions seems to be established by the evidence.

George Spooner, the first witness for complainants, who was a nearby neighbor, testified that she, the grantor, had several times told his wife that she was afraid that he, the witness, would kill her, "that the echoes had told her I was going to kill her." He testified further that he would see her walking around her house at night with a light, and that he was "afraid she would burn him out, kill herself, or something;" that he, with others of the community, because of their belief that she was mentally defective, and before the deed was made, initiated proceedings to have her adjudged insane and committed to the hospital for the insane at Chattachoochee, but that the proceedings were abandoned when a daughter and her husband asked to be permitted to take her and care for her in their home.

C. T. McDaniel, a witness for complainants who lived near the grantor during the later years of her life, testified that in his opinion she was mentally unsound. And he also testified of the fear entertained and expressed by her that the witness George Spooner would kill her.

Tom Travis, one of the complainants, a son of the grantor, testified that "She was just like a child, just had to nurse her like a child. I have held her in my lap a many of a time and give her medicine and often she

would go around the house until she fell down if some-
body didn't stop her; she would pick at the doors and
pick at the clock, go to the well and get a drink of water
and back and go around the well, it was just continually
that way until somebody stopped her; she was scared
of me, scared of my children, and I would prevail with
her and tell her we would not hurt her, we were her own
dear children and sometimes she would recognize us and
sometimes she wouldn't."

Eli Banks, one of the complainants, the son-in-law into
whose home the grantor was taken when the proceedings
to have her adjudged insane were abandoned, in his testi-
mony said: "I carried her to my home and at night she
would get up and try to get out of the house and I had to
lock the door to keep her from getting out and one night
she did get away and got down below a gentlemen's house
named ———— and would holler, 'Rayfield, Rayfield,
what you setting that house on fire for.' I heard her
about half a quarter from my house across the field and
found her and got her and said, 'Come on back home,
what's the matter?' She said, 'Don't you see the fire,
that boy is burning up my house,' and I taken her and
carried her back home and from then on I had to lock
the house up and stay in there myself because sometimes
she would get away."

Mary Banks, one of the complainants, the wife of Eli
Banks and daughter of the grantor, in detailing the acts
of the grantor which indicated to her, the witness, that
the grantor was incompetent, said: "Well, in the first
place some nights she would get up in bed at dead
hours of the night and put on her clothes and string up
her shoes and put all her clothes on the trunks and open
drawers and doors and sit out in the middle of the floor

and I would wake up and ask her what she was doing out there and she said she was fixing to move, she was looking for the echoes to come and move her, and in once instance she got away and I would have to go and hunt her and she would talk rough by-words, talk to herself all night and some nights she would get up and go out on the porch and holler just as loud as she could talking to the echoes, said they would come and move her. I had a little baby at that time and she would tend to it sometimes and threaten to throw it outdoors and then she would pick at the doors and windows and for half hours would walk back and forth picking at them and walking." This witness testified further that the defendant, Sim Travis, the grantee in the deed under consideration, with whom the grantee made her home, at least acquiesced in the action taken to have her confined in the hospital for the insane on the theory that she was mentally deficient at the time. The testimony of the witness on this point is as follows: "Q. When they started to send her off to the insane hospital, was Sim Travis one of the parties trying to send her off? A. Yes, sir, one of the head ones, because he sent me word about two weeks before that to come see about my mother that she was losing her mind, she would wander through the field at night and he would find her and I went up there and prevailed with her to come and live with me and she said yes and the next I heard she was on the way to the hospital and I got my husband to go up there that evening and bring her to stay with me. Q. Did Sim say anything to you about whether or not she was crazy? A. Yes sir. Q. What did he say to you about it? A. He told me she was losing her mind, that she was gone perfectly crazy at times and he could not be at home to see after her and

his wife was kind of afflicted and he was going to send her to the hospital and did have her on the way there. My sister-in-law come down that day at noon and told me about it. Q. You mean Sim's wife? A. No sir, my other brother's wife. She comes down and tells me to go and see the last of my mother, that my brother was fixing to send her to the asylum, and sure enough she was at the depot and my husband taken her and brought her home with him and she stayed until he come and taken her away again."

There is other testimony for complainants to a like effect. What is recited is for the purpose of illustrating the character of the evidence offered by complainants. On the other hand there is testimony of witnesses for defendant in which the opinion is expressed that the grantor was mentally capable at the time of the execution of the deed to understand and comprehend what she was doing when the deed was made.

W. B. Benenbaugh, a witness for defendant, the officer before whom the deed was signed and acknowledged, testified that at the time of the execution of the deed before him he inquired why she made the deed to Sim Travis, the defendant, her son, and in reply "she said she promised it to him because he promised to take care of her as long as she lived, and I asked her if that was the understanding and she said yes. So far as being crazy I didn't think about that." He testified further that the deed was executed at the home of the grantee; that the grantor was living there at the time, and that he, the witness, judged by the way she made the deed that she was able to attend to ordinary business matters; that the defendant engaged him to prepare the deed and go to his home and take the acknowledgment of the grantor and paid him for the service.

J. H. Pope, a witness in behalf of defendant, testified that he was one of the witnesses to the deed and he identified his signature upon it as a witness. He testified further that he lived near the grantor and that ''she seemed to be perfectly rational at times that day (meaning the day of the execution of the deed) and seemed to know what she was doing." Upon cross examination it was developed that this witness was one of the parties to the petition to have the grantor adjudged insane.

J. N. Wilson, at whose store the grantor bought goods, testified that she was in his store a short while before she went down to Eli Banks', the son-in-law into whose home she was taken at the time of the institution of the insanity proceeding, and at that time "she could change money and ask the price of things and if she thought it was too high she wouldn't buy it"; that he saw nothing wrong with her mental condition at that time. He further gave testimony as follows: "Q. You are not in a position to swear positively whether she was or was not insane? A. At what time? Q. At any time prior to her death? A. Yes sir, I am in a position to swear she was not insane."

W. H. Ham, a witness for defendant, testified that he knew the grantor during the year 1915, the year before she died; that he "never did hear of her being crazy." Testifying further, he said: "A. I asked her did she know what she was doing when she made this deed and she said, 'That I did,' said, 'I know just as good as anybody, I want Sim to have the land.' Q. Did she say anything about whether Sim supported her? A. Said he was taking care of her and she wanted him to have it. Q. How long was that before she died? A. About a year, I don't recollect the date exactly, I know it was at

least a year." Testifying further, he said: "Q. How came you to ask her? A. The question came up and Eight told her she didn't know what she was doing and I asked her, I said, 'Aunt Mary did you know what you were doing when you made that deed to Sim?' She said 'That I did, I knowed just as good as anybody.' "

H. J. Burke, a witness for defendant, testified, with respect to the mental condition of the grantor at the time of the execution of the deed under consideration, as follows: "Q. State what her mental condition was. A. Good as it has ever been so far as I know. Q. Did she indicate she had lost her mind? A. No sir. Q. Could she talk intelligently on matters? A. Yes sir. Q. Did you hear her make a statement about the deed she made to Sim? A. Yes sir. Q. State what she said. A. She said all the boys had forsaken and left her and she had done made Sim a deed to the balance of the land, had made Eight a deed to half an acre of the land, that was the land we were staking off so they could fence it, and she wanted Sim to have the balance and had made him a deed. I forget whether the party that drew this deed was there or not, but anyhow me and Mr. Pope and ————— were there and settled the lines and Sim give back a little, give Eight a little more than was coming to him. Q. You say you saw nothing to indicate she was crazy? A. Not a thing in the world. Q. How long you been knowing her? A. Since 1901.

Sim Travis, the defendant, testified that at the time the grantor made the deed her mind was all right and she knew what she was doing. He also testified that he had lived with his mother all his life and took care of her during all the latter years of her life. He denied that he initiated the proceeding to have his mother confined in

the hospital for the insane at Chattahoochee and asserted that he had absolutely nothing whatever to do with it.

The deed was executed on the 30th day of October, 1915, after the proceeding to have the grantor's mental condition inquired into was suggested and abandoned, and she died on the 31st day of May, 1916, being at the time about eighty years of age. That she was in a weakened mental and physical condition at the time of the execution of the deed is, from all the testimony, an inescapable conclusion, but it does not follow that she was incompetent at the time to make a valid conveyance of her property. To avoid the conveyance it is necessary to prove that the powers of her mind were so affected as to render her incapable of comprehending the nature and effect of the transaction. There is direct conflict in the evidence on this point and it may be said that the witnesses for the complainants had a better opportunity of observing the conduct and of judging the mental condition of the grantor, but to this it may be replied that most of them were interested in the result of the suit, whereas the witnesses for defendant, with the exception of defendant himself, were, so far as the record shows, not interested. It may also be said that the circumstance that the effect of the deed was to give all that the grantor possessed to one child and exclude all others bearing the same relation to her should have weight in the consideration of the case, and this is true, but the fact that she had made her home with this son during the latter years of her life and that he had cared for and contributed to her maintenance during that period should also be given weight, and in that situation, giving this property to him, which was of the value of approximately $1,000, does not

necessarily indicate irrationality, but may with as much reason indicate that she was grateful for what he had done and was attempting in a measure to repay him. There is no evidence that there was any undue influence exerted over her.

The testimony seems to have been taken before the chancellor, and the rule is that where the testimony is conflicting, but there is evidence to support the finding of the chancellor, the decree will not be reversed unless it clearly appears to be erroneous. Hill v. Beacham et al., 79 Fla. 430, 85 South. Rep. 147; Douglas et al., v. Ogle, 80 Fla. 42, 85 South. Rep. 243; Whidden v. Rogers, Jr., Trustee, 78 Fla. 98, 82 South. Rep. 611; Boyd v. Gosser, 78 Fla. 64, 82 South. Rep. 758; Brickell v. Town of Ft. Lauderdale, 75 Fla. 622, 78 South. Rep. 681; Manasse v. Dutton Bank, 75 Fla. 327, 78 South. Rep. 424; Mickens v. Mickens, 75 Fla. 391, 78 South. Rep. 287; Smith v. O'Brien, 75 Fla. 252, 78 South. Rep. 13; Simpson, Trustee, v. First National Bank, 75 Fla. 539, 77 South. Rep. 204; Farrell v. Forest Inv. Co., 73 Fla. 191, 74 South. Rep. 216; Guerra v. Guiterrez, 66 Fla. 570, 64 South. Rep. 232. Stated somewhat differently, the finding of a chancellor on conflicting evidence will not be disturbed by an appellate court where the mind cannot repose with entire confidence and certainty on a conclusion in favor of either party. Baggett v. Otis, 65 Fla. 447, 62 South. Rep. 362; Slorah et al. v. Wilson, 59 Fla. 601, 52 South. Rep. 12.

The presumption is that the grantor was sane and the burden of proof upon the issue of her alleged mental incapacity to make a valid conveyance was upon complainants. As we have said, there is conflict in the evi-

dence upon this issue, and the decree appealed from does not clearly appear to be erroneous.

The decree is therefore affirmed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND ELLIS, J. J., concur.