[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 732 
Frank Adams, because of sterling character and keen business ability, had enjoyed almost phenomenal success as a farmer, merchant and banker. In his early life he resided in Jasper, and subsequently removed to Jacksonville, where he became the president of one of Florida's largest and strongest financial institutions. In this, as in his other business ventures, he was energetic, able, successful. As a result of his acumen, he amassed a large fortune. Not content with progress which enhanced his personal wealth, he gave of his talents to the State by serving in public office, was on two occasions president of the State Senate.
About twenty years ago, he fell victim to a disease known as paralysis agitans, and because of its ravages retired from active business, save that in a supervisory capacity he maintained *Page 733 
a connection with one of his enterprises in Jacksonville. For about twenty years, too, his blood pressure has been far above normal. Affluent, he maintains a staff of household servants sufficient to insure every comfort possible in his present physical condition, and, since 1921, has been continuously attended by his wife, by training a nurse. After many years of comparative business inactivity his interests are still valued at several hundred thousand dollars.
Nat Adams, a bachelor and brother of Frank, was also successful in the business world, and exhibited many of the fine traits of character that were peculiar to Frank Adams. He, too, was rewarded for his industry and acumen by the accumulation of property, said to be worth seven hundred thousand dollars.
Death came to Nat Adams, February 2, 1937. He left no will disposing of his estate, and was survived by his brother, a sister, Mrs. Minnie A. Strickland, and the following children of a deceased sister; W.A. Saunders, Doctor Albert F. Saunders and Julie Saunders Dickerson. Immediately after Nat Adams died, a search was made for his will, but none could be found, and subsequently an administrator was appointed for his estate.
February 6, 1937, Frank Adams and Rubye Adams, his wife, Minnie A. Strickland and A.J. Strickland, her husband, Julie A. Dickerson and R.G. Dickerson, her husband, W.A. Saunders and Albert F. Saunders executed an agreement reciting the belief of the parties that, although Nat Adams died intestate, it was his intention to dispose of his property as the parties therein provided, by to-wit: (1) establishing a trust fund for a colored servant, (2) setting up another trust fund for the upkeep of the family cemetery, (3) making an expenditure for the erection of a wall around said cemetery, and (4) distributing the net proceeds one-half *Page 734 
to W.A. Saunders, one-third to Julie A. Dickerson (one hundred thousand dollars of which was to be used as a trust fund for her benefit) and the remaining one-sixth to Albert F. Saunders.
On May 15, 1937, the same parties executed a confirmatory agreement, ratifying the one of February 6, and setting out that the things which were to be done under the latter had been accomplished.
This is the background of the litigation which is brought here for review.
In June, 1937, a bill of complaint was filed by F. Adams, by his next friend, L.S. Adams, charging that the agreement of February 6 was the result of a conspiracy on the part of W.A. Saunders, Albert F. Saunders, R.G. Dickerson and others to cause Frank Adams to convey his interest in his brother's estate at a time when he was mentally incapable of comprehending the transaction and when the will of the conspirators was substituted for that of Frank Adams. By the pleading it was sought to invalidate the instrument providing for the distribution of the estate.
The various defendants answered, and Frank Adams filed his petition in the cause, styling his "next friend," L.S. Adams, an intermeddler; stating that the bill was filed without his knowledge; charging that the proceeding was "acquiesced in" by all of his children; denying the allegations of fraud, undue influence and his own mental incapacity; and praying for dismissal of the bill.
L.S. Adams, next friend, answered the petition and re-asserted the prayers of the bill.
The chancellor, after taking testimony for about thirty days and hearing argument for two days, dismissed the bill by a very comprehensive decree, which has proven helpful *Page 735 
to this Court in considering the record of more than 4,000 pages.
It seems unnecessary to search beyond the decisions of the Supreme Court of Florida to announce the rule by which the evidence shall be weighed in determining whether Frank Adams was mentally incompetent at the time he executed the instruments of February 6 and May 15, and if he was unduly influenced to give away his share of his brother's estate. We refer to the opinions in. Rich v. Hallman, 106 Fla. 348, 143 South. Rep. 292, Travis v. Travis, 81 Fla. 309, 87 South. Rep. 762.
In the case of Rich v. Hallman, supra, the complainant brought suit to set aside a gift made to her nurse, the only consideration for which was that the attendant would remain with the donor as long as the latter lived. It was charged that the transfer grew out of deceit and trickery, and that assignor was ignorant of its nature or legal effect. Placing emphasis on the influence exerted by a young person of alert mind upon one of advanced age, a confidential relationship existing between them the Court said the burden was on donee "to show conclusively that the gift to her * * *" was free of undue influence.
In the latter case (Travis v. Travis, supra), the contest was between heirs of a grantor to invalidate a deed made by an imbecile. The Court announced that:
"* * * The only question presented and argued is whether in view of the evidence, the decree should have been for defendant; the contention being that the evidence was sufficient to establish the fact of the mental incompetency of the grantor to make a valid deed at the time of the execution of the conveyance." 87 South Rep., text 762.
The rule followed in answer to that question was:
"The presumption is that the grantor was sane, and the *Page 736 
burden of proof upon the issue of her alleged mental incapacity to make a valid conveyance was upon complainants." 87 South. Rep., text 765. See also Hassey v. Williams, 127 Fla. 734, 174 South. Rep. 9, text page 11.
Applying these rules, it would seem that the bearer of the burden of proof with respect to undue influence would be Frank Adams, but a rather anomalous situation is produced by his repudiation of the act of his next friend in bringing the suit and the issues made by the petition of complainant, himself, and the answer of his representative. Even invoking the rule in its strictest sense and placing upon complainant this burden despite his petition, we cannot conclude that there is not a preponderance of evidence to support the finding of the chancellor that there was lack of this element in the transaction.
In Peacock v. Du Bois, 90 Fla. 162, 105 South. Rep. 321, we find at page 332 the following:
"In Howard v. Farr, 115 Minn. 86, 131 N.W. 1071, the Court said:
" 'To constitute' undue influence, 'the mind * * * must be so controlled or affected by persuasion or pressure, artful of fraudulent contrivances, or by the insidious influences of persons in close confidential relations with him, that he is not left to act intelligently, understandingly, and voluntarily, but * * * subject to the will of purposes of another.'
"In Myatt v. Myatt, 149 N.C. 137, 62 S.E. 887, the Court said that, to constitute 'undue influence,' it is unnecessary that moral turpitude or improper motive should exist, and if one, from the best motives, having obtained a dominant influence over a grantor's mind, induces him to execute a deed or other instrument materially affecting his rights, which he would not have otherwise executed, so exercising *Page 737 
the influence obtained that the grantor's will is effaced or supplanted, the instrument is fraudulent."
The first part of this quotation appears in the final decree.
From the record, it seems that the person nearest grantor, hence more likely to have influence over him, was his wife, nurse and companion, but she could hardly be charged with artful or insidious influence when she joined him in the deed disposing of an interest, part of which she, upon his death would receive. Another grantor, his sister, likewise was conveying her undivided third interest without monetray consideration and in such circumstances that artifice, fraud or deceit could not be attributed to her. These persons, particularly the first, seemed to have enjoyed the confidence of Frank Adams more than those who were actually benefited.
Our study leads us to the conclusion that by a preponderance of the evidence there was no taint of undue influence, and that the transfer was motivated by a desire on the part of Frank Adams and Minnie A. Strickland to do what they thought Nat Adams would have done, had time been given him to make a will. To ascribe to them any other motive does not seem logical. Each suffered a loss of thousands of dollars. The act of Adams was the same, of course, as that of his sister. It would be unnatural to attribute to either the motives of spite or hatred, and we feel no justification for deciding that the nieces and nephews brought about the transfer by undue influence.
The last problem is the one relating to the mental competency of the complainant. According to the announcement of the law on this subject in Travis v. Travis, supra, it must be shown that the mind was in such condition that the grantor could not comprehend the nature of the transaction. *Page 738 
Numerous witnesses, of varied business and professional experience, testified about the mental state of the complainant. A dealer in poultry, lawyers, a merchant, bankers, a salesman, business associates, a masseuse, a circuit judge, personal servants and a gardener related their observations of his actions during periods ranging from several years to comparatively shorter times.
Many physicians gave their opinions of his mental health and the probability or improbability of his comprehension of the transaction here under question. It is noteworthy that much of the testimony supporting allegations of his incapacity was based on hypothetical questions, while the doctors who had attended him very generally agreed that he was mentally fit to understand his action. See Mason v. State Bank of Orlando,94 Fla. 132, 113 South. Rep. 664.
That complainant was subject to delusions at times, probably traceable to the effects of the drug hyoscine, was established, but the evidence falls far short of preponderating in support of the theory that at the time of the original and confirmatory agreements he did not "comprehend the effect and nature of the transaction."
Throughout a disheartening physical ailment, he seems to have maintained an interest in affairs of the day, business, the stock market and other topics which engage the attention of well informed men, and at this time, after an era of financial instability that has taxed the most sagacious, and after being physically helpless for nearly twenty years, is possessed of the fortune which he had the ability to accumulate and the wisdom to preserve.
A further discussion of the evidence hardly seems necessary. The application of the principles discussed above in the light of exhaustive briefs and comprehensive argument of counsel, leads us to the conclusion that the chancellor's *Page 739 
decision was proper, so the final decree dismissing the bill is affirmed.
TERRELL, C. J., and WHITFIELD and BROWN, J. J., concur.
BUFORD, J., concurs specially.
CHAPMAN, J., disqualified.