Tom Saliba, *et ux.*, v. Leon James, as Guardian of John F. James, an Insane Person.

196 So. 832
Division B
Opinion Filed June 18, 1940
Rehearing Denied July 8, 1940

*John H. Carter* and *John H. Carter, Jr.,* and *B. L. Solomon,* for Appellants;

*Paul Carter, R. S. Pierce, Jr.,* and *Thomas E. Walker,* for Appellees.

CHAPMAN, J.—On October 28, 1938, Leon James, as guardian of the estate of John F. James, an insane person, filed in the Circuit Court of Jackson County, Florida, a bill of complaint, but subsequently amended, in which it was alleged that John F. James on October 20, 1938, was by the County Judge's Court of Jackson County, Florida, adjudged insane and by an appropriate order committed to the Florida hospital for the insane. For some time prior to the institution of the insanity proceedings, John F. James had been in the custody of the defendants, Tom Saliba and wife, Tee Saliba, and had been kept in a room and the door thereto locked and the key retained by the said defendant.

It is alleged that the defendants for some time had operated a jook or resort located just west of the City of Marianna and commonly known as "The Triangle." Their home was located near their jook and during the month of May, 1937, John F. James went to their home to live and remained there until adjudged insane on October 20, 1938. John F. James at that time was approximately seventy years of age, weak in mind, and had used intoxicants excessively for many years past. The use of whisky had impaired his mental faculties and because of his mental condition was unable to transact business. The habit of drink on the part of John F. James estranged him from his son,

Leon James, then living on a farm near Marianna. He left the home of his son in April, 1937, and in May, 1937, began living with the Salibas.

It was alleged that John F. James in May, 1937, when he went to live with the Salibas had cash, stocks, bonds and personal property worth in excess of $30,000.00. The Salibas, having knowledge of the money and property owned by John F. James, professed for him great friendship, took him to live in their home, supplied him with intoxicants, coddled and pampered him and each act of the Salibas was a step in a scheme or conspiracy to fraudulently obtain the money and property of John F. James. The Salibas obtained checks signed by John F. James dated from May, 1937, and monthly thereafter until October, 1938, approximating $27,100.00 payable to the Salibas. Additional checks approximating $435.00 were issued by John F. James to business concerns around Marianna and the property obtained thereby delivered to the Salibas. John F. James, in August, 1938, gave Mrs. Tee Saliba a Buick automobile valued at about $1,000.00.

The bill alleged that the Salibas, in the furtherance of their fraudulent conspiracy, induced John F. James to make his last will and testament in which he devised all of his property to Tom Saliba and thereby revoked a former will in which all of his property was devised to his blood relatives. The will was not only unlawfully executed but John F. James' name was obtained thereto when his mental faculties were impaired and he was unable to comprehend or understand the nature and quality of his acts. The checks, automobile, rings and purchases at the different stores were obtained when John F. James was mentally weak and infirm and at the time he did not understand the nature and quality of his acts.

The bill of complaint sought the appointment of a receiver to take over the money paid by John F. James to Tom Saliba and Tee Saliba then in the possession of the banks at Marianna, as well as to take over the custody of the Buick automobile, rings and aeroplane and hold the same subject to the order of the court; that the proceeds of the checks delivered to the Salibas be decreed to be the property of John F. James, and that the last will and testament made by John F. James making Tom Saliba the sole legatee and devisee be decreed null and void.

The defendants by joint and several answers denied John F. James was by them imprisoned in their home; and denied the allegation of the scheme and conspiracy to obtain the money and property of John F. James. Each and every material allegations of the bill of complaint and amendment was answered, confessed or denied. The several business transactions wherein the several sums of money were obtained by the defendants were carefully explained. It was further contended that an estrangement existed between John F. James and his son, Leon James, and he had no living blood relatives to whom he could bestow his property and gave it to the Salibas at a time when he was in possession of his faculties and understood the several transactions; and that the said John F. James, as a matter of fact, was mentally qualified to transact all of his said business and had a lawful right to give each of the answering defendants the property described.

Several hundred pages of testimony were adduced by the respective parties before the Honorable E. C. Welch, Circuit Judge, and on final hearing a decree was by him entered in which it was decreed: (a) that the equities of the cause were with the plaintiff; (b) a receiver was appointed and the banks required to deliver to him the said sum of $18,321.03

which was impressed with a trust in favor of the plaintiff;
(c) the transfer of the Buick car was set aside and can-
celled; (d) the transfer of the ring to Mrs. Tee Saliba was
cancelled and the car and ring decreed the property of John
F. James; (e) the dining room set and china set and dining
room cabinet were decreed the property of John F. James,
an insane person; (f) the aeroplane purchased by Tom
Saliba with money of John F. James was impressed with
a trust in the sum of $1,175.00; (g) that certain real estate
be impressed with a trust for the sum of $3,000.00; (h)
the purported will dated August 4, 1938, was cancelled and
revoked; (i) a special master was appointed to execute the
decree; and (j) the court retained jurisdiction for the pur-
pose of fixing the amount of fees for plaintiff's solicitor.
The final decree was entered on September 26, 1939, and
an appeal taken to this Court on the same date.

On October 28, 1939, without notice to counsel for de-
fendant below, the court heard all the pertinent testimony
offered, and entered an order fixing the compensation of
the receiver at the sum of $350.00 and a reasonable fee and
compensation for plaintiff's attorneys in said suit at the
sum of $7,500.00. An appeal was taken therefrom to this
Court. The transcripts have been perfected and lodged in
this Court and on an order of this Court the two appeals
have been consolidated and the same disposed of in one
opinion.

Counsel for the respective parties in briefs filed have
propounded a number of questions to be decided herein by
this Court. While many of these questions so propounded
may be material or pertinent, it appears in its last analysis,
the case at bar must turn on the question of the sanity of
John F. James between the dates of May, 1937, and October,
1939. If John F. James was sane at the time these several

gifts were made and John F. James was not unduly influenced by the Salibas, then the decree appealed from should be reversed; If John F. James was insane between the dates, *supra,* when the several gifts were made, the decree must be affirmed.

Counsel for appellants contend that the property transferred from John F. James to the Salibas, as described in the bill of complaint and amendment, were each gifts and at the time each was made the donor was suffering from some mental weakness due to the excessive use of intoxicants but the mental weakness did not incapacitate him from the transaction of business. The leading cases cited to sustain this conclusion are, viz.: Gardiner v. Goertner, 110 Fla. 377, 149 So. 186; Godwin's Heirs v. Godwin, 92 Fla. 937, 111 So. 240; Travis v. Travis, 81 Fla. 309, 87 So. 762; Clarke v. Hartt, 56 Fla. 775, 47 So. 819; Conley v. Nailor, 118 U. S. 127, 6 Sup. Ct. 1001, 30 L. Ed. 112.

It is the contention of counsel for appellee that the property transfer from John F. James to the Salibas was without consideration and void *ab initio,* and at the time of each transfer, as set out in the bill of complaint, John F. James was insane. The Florida cases cited to sustain this view are, viz.: *In re:* Donnelly Estate, 137 Fla. 459, 188 So. 108; Lockwood v. Walker, 127 Fla. 20, 172 So. 359; Rich v. Hallman, 106 Fla. 348, 143 So. 292; Sheppard v. Cherry, 118 Fla. 473, 159 So. 661; Sapp v. Warner, 105 Fla. 245, 141 So. 124; Douglas v. Ogle, 80 Fla. 42, 85 So. 243. We have carefully examined the authorities cited by counsel for the respective parties and fully agree with the holdings in each of these cases.

In the case of Gardiner v. Goertner, 110 Fla. 377, 149 So. 186, this Court reaffirmed the rule which renders null and

void a will or deed made by a person of weak mind when it said:

"A court should not set aside a will, deed or other agreement for mere mental weakness if it does not amount to inability to comprehend the effect and nature of the transaction and is unaccompanied by evidence of imposition or undue influence. Douglas v. Ogle, 80 Fla. 42, 85 So. 243; Travis v. Travis, *supra;* Clarke v. Hartt, 56 Fla. 775, 47 So. 819; Waterman v. Higgins, 28 Fla. 660, 10 So. 97."

In the case of Hassey v. Williams, 127 Fla. 734, 174 So. 9, when considering the acts and doings of feeble-minded persons, this Court said:

"A few cases hold that the deed of an insane or feeble-minded person is void *ab initio* and that an innocent purchaser has no recourse against it, but the decided weight of authority is to the effect that such a deed is not void but voidable only, depending on whether or not an inequitable advantage, fraud, or want of consideration was practiced on the grantor or whether the grantee had knowledge of the grantor's insanity. Douglas v. Ogle, 80 Fla. 42, 85 So. 234; Sheppard v. Cherry, 118 Fla. 473, 159 So. 661; French Lumbering Company v. Theriault, 107 Wis. 627, 83 N. W. 927, 81 Am. St. Rep. 856, 51 L. R. A. 910; Green v. Hulse, 57 Col. 238, 142 Pac. 416; Walton v. Malcolm, 264 Ill. 389, 106 N. E. 211; Downham v. Holloway, 158 Ind. 626, 64 N. E. 82, 92 Am. St. Rep. 330; Brown v. Brown, 209 Mass. 388, 95 N. E. 796; Smith v. Ryan, 191 N. Y. 452, 84 N. E. 402; Huhrs v. Hancock, 181 U. S. 567, 45 L. Ed. 1005, 21 Sup. Ct. 726; Delvin on Deeds, Vol. 1, Sec. 73; Jones on Real Property, Vol. 1, Sec. 52; Washburn on Real Property, fifth edition, 486; Kerr on Real Phoperty, Sec. 2316.

"This Court is committed to the rule that mere mental weakness will not authorize a court of equity to set aside

a deed if such weakness does not amount to inability to comprehend the effect and nature of the transaction and is not accompanied by evidence of imposition or undue influence. The presumption always supports the validity of the deed and the sanity of the grantor until overcome by a preponderance of the evidence. The deed will under no circumstances be void unless proven that the mind of the grantor was so affected as to render her incapable of comprehending the nature and effect of the transaction. Clarke v. Hartt, 56 Fla. 775, 47 So. 819; Waterman v. Higgins, 28 Fla. 660, 10 So. 97; Travis v. Travis, 81 Fla. 309, 87 So. 762; Baars v. Alger Sullivan Lumber Co., 81 Fla. 308, 87 So. 918."

It is deducible from the authorities, *supra,* that to make a gift legal and binding the donor must possess sufficient mental capacity and the test of mental capacity so required is said to be whether or not the donor has the mental ability to understand the nature and effect of the transaction. If it is shown that the donor has sufficient intelligence to know what he was doing at the time the gift or gifts were made, the same generally will be sustained. An habitual drunkard is presumed competent when sober to make a gift unless it appears that the use of intoxicants has impaired his mental faculties. See 24 Am. Jur., page 737, par. 16.

Thornton on Gifts and Advancements, pages 54-5, par. 60, is, viz.:

"60. LUNATIC AS DONOR.—A lunatic can no more make a gift of his property than he can sell it; but just as he may make a sale of it or will of it in a lucid interval, so he may make a gift of it; and the person attacking the validity of his gift upon the ground of his insanity has the burden of showing his incapacity to make the gift."

The mental capacity of a donor to make a gift is treated in 28 Corpus Juris, pages 626-7, par. 17, viz.:

"MENTAL CAPACITY. It is essential to the validity of a gift that the donor shall have sufficient mental capacity to make a gift; a gift by a donor mentally incompetent is void. Some authorities hold that the test of mental capacity to be applied to a completed gift is the same as that to be applied to any other contract and not that of testamentary capacity. Others hold that capacity to contract is not required, but that it is sufficient if the donor is mentally competent to execute a will. The general rule is that, if the donor has sufficient mental capacity to comprehend the transaction, if he understands the extent and value of his property, what persons are the objects of his bounty, and the manner in which he is distributing his property among them, his gift will be valid. It is not necessary that the donor should have sufficient mental capacity to transact business generally. Neither age, nor physical weakness and debility, nor disease of the body, nor even mental weakness, will affect the validity of a gift, where the donor has sufficient intelligence to understand the nature and effect of his act. Unsoundness of mind may exist on certain subjects without affecting the donor's capacity to make a valid gift. On the other hand, in order to set aside a gift of property because of unsoundness of mind of the donor, it is not essential to show that he was an idiot or an imbecile at the time. It is sufficient to show that he was laboring under a delusion out of which he could not be reasoned, which led him to make the gift, and which so took possession of his mind that he could not act upon the subject sensibly * * *."

The record shows that John F. James was around seventy years of age and had accumulated an estate valued at approximately $75,000.00. He drank whisky for many years

and after the death of his wife in 1934 he drank considerably more. He moved from Tulsa, Oklahoma, to Marianna, Florida, to be near his son, and his bank account was changed to the banks of Marianna. He resided with his son for a few months, but friction arose and in April, 1937, he obtained a room at the Chipola Hotel and later obtained a room with the Salibas. The Salibas supplied John F. James with plenty of whisky and provided a room for him in their home, and there is evidence to sustain the conclusion that he was confined to his room by the Salibas, as he frequently called to people passing the house to assist him in getting out of the room where he was locked in and the Salibas possessed the key. One or two witnesses approached the Salibas and asked that the old man be released and the Salibas replied that the old man was crazy and not to pay any attention to him. It is contended that he was locked up in this room from September to around the 20th of October, 1938, when an officer took him to court for a sanity hearing. It was the opinion of some of the doctors that the old man had been mentally deranged since 1934.

A nurse who attended Mrs. James at the time of her death in 1934, likewise attended John F. James for some time after the death of his wife, and she testified that he was mentally unbalanced as early as 1934. The plaintiff offered many witnesses who testified to the peculiar action and conduct of John F. James after reaching Marianna in 1937 until sent to the hospital for the insane in October or November, 1938. Dr. Joyner treated John F. James in June, 1938, and it was his opinion that Mr. James was sane but his age and the excessive use of intoxicants caused mental weakness. Other physicians expressed a similar view and the defendants produced a number of witnesses who testified as to the sanity of Mr. James.

All of the witnesses are in accord on the conclusion that John F. James was insane on October 20, 1938. The disputes or conflicts arise over the time when John F. James became insane. Some of the witnesses expressed the view that he was of sound mind when the last check was given to Mrs. Saliba around the 18th of October, 1938, while others thought or believed he was sane in the early portion of 1938, and a number of other witnesses were of the opinion that John F. James was insane from 1934 until the time he was adjudged insane by the County Judge's Court of Jackson County. Florida.

The chancellor on final hearing decreed the equities of the cause to be with the plaintiff and thereby settled the disputed questions of fact. This Court will not interfere with the conclusions of a chancellor on questions of fact unless it is shown to be contrary to the weight of the evidence. We find ample testimony in the record to support the final decree entered by the chancellor below.

In the supplemental appeal it is contended that the sum of $7,500.00 as attorneys' fees and compensation for the plaintiff for professional services for handling the case at bar was excessive in that the amount recovered was less than $23,000.00. The order allowing this amount recited that the chancellor received evidence on the question of the amount of the fee to be allowed, but the evidence offered upon which the order is based was not made a part of the record. It is possible that attorneys having knowledge of the amount that would be reasonable for such services gave testimony, but this Court is left to the entire record, the work performed, the briefs filed by counsel and the argument at the bar of this Court, and while we are hesitant to reduce the amount of compensation allowed counsel in the case at bar, we are forced to the conclusion that allowance

of some 30 per cent or 32 per cent of the amount recovered is excessive. We do not overlook the fact that the Salibas cashed checks of John F. James totaling approximately $27,000.00, but the chancellor below held that a portion thereof were bona fide transactions between the Salibas and John F. James. In determining what is reasonable compensation to be paid an attorney for his services, the beneficial results secured should be considered and also the importance of the litigation.

This Court, in fixing the amount of the fee to be allowed attorneys in Monroe v. Birdsey, 102 Fla. 544, 136 So. 886, said:

"The question of attorney's fees is a very delicate one to treat. The law authorizing a fair, just, and reasonable compensation comporting with the services rendered,. but the elements that enter into the determination of such an amount are many and varied. The services performed, the responsibility incurred, the nature of the service, the skill required, the circumstances under which it was rendered, the customary charges for like services, the amount involved, and the ability of litigants to respond may be mentioned as some of these elements * * *."

The length of time required on part of counsel to prepare pleadings, the work performed in obtaining evidence offered at the trial, the length of time to take all the testimony, the amount involved in the litigation, and the responsibility and skill required are factors to be considered in determining the amount of compensation of attorneys for the plaintiff below. The record here is voluminous and counsel have rendered valuable services which are clearly reflected by the record. After studying the entire record we have concluded that a fee of $5,000.00 is the maximum amount that

416

should be approved by this Court as compensation for attorneys for the plaintiff.

The final decree appealed from dated September 26, 1939, is affirmed. The order allowing $7,500.00 as compensation for plaintiff's attorneys is reversed with directions to enter an order permitting or allowing a sum not to exceed the sum of $5,000.00 as a reasonable attorney's fee for plaintiff's attorneys.

It is so ordered.

WHITFIELD, P. J., and BROWN, J., concur.

BUFORD, J., concurs in opinion and judgment.

Chief Justice TERRELL and Justice THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.