ESTATE REALTY CORP., *et al.*, v. ANNA TAUBEL, *et al.*

154 So. 222.
Opinion Filed April 2, 1934.

*Kay, Adams, Ragland & Kurz* and *Roland W. Granat,* for Appellants;

*Vincent C. Giblin, Leo Rosen, Simonhoff & Simonhoff* and *Loftin, Stokes & Calkins,* for Appellees.

ELLIS, J.—The facts in this case are more numerous than obscure, and present a situation less involved than intricate. It has required in the estimation of counsel three comparatively large volumes of typewritten matter of about two hundred and seventy pages each to contain the pleadings and evidence introduced. It is not so difficult to understand the interests of the many persons who appear from time to time in the story of the transaction as to follow the devious ways and bypaths which they followed to attain their objective. To trail each person's activities through the period of a few weeks during which he or she was interested in the subject matter of the litigation and ascertain their relation, if any, to another's activities, except in so far as all constitute together one component whole, is like following the intricate tracery of an arabesque. Aside from the motif or dominant feature of the transaction considered in its entirety, many of the incidents may be regarded as more embellishment than structure.

The case originated in a mortgage executed by a corporation named Estate Realty Corporation, on September 6, 1928, upon Lots 4 and 5 of Block 69 of Ocean Beach Addition No. 3, in Dade County, together with all the improvements upon the place, consisting of a hotel building known as the "Admiral Hotel" and all the furniture and furnishings therein contained. The property is located in Miami Beach, Florida. The mortgage was executed and delivered by the corporation to William Taubel to secure the payment of nine promissory notes of $10,000.00 each, payable over a period of nine years, all notes bearing interest at 7 per centum per annum, payable semiannually. The mortgage provided for the payment of attorneys' fees for

collection and contained provisions for the payment of taxes, insurance and repairs by the mortgagor and for the acceleration of the maturity of the debt on certain defaults in the payment of principal and interest and in performance of the covenants and agreements.

On the 14th day of March, 1932, Taubel transferred to his wife, Anna Taubel, the notes and mortgage. The first note was paid and $4,000.00 on the second was paid. Interest was paid to September 6, 1931, but the note falling due on that date has not been paid. Since that date to February 1, 1933, there have been paid to the owner of the note $6,931.00 and to July 7, 1933, she has disbursed for insurance and taxes $6,382.02.

Four years after the execution of the mortgage the Estate Realty Corporation leased the hotel to Tavern Investment Company, a Florida corporation, for a term of one year, to expire August 31, 1933. The rental to be paid was $5,000.00 and 50 per cent of the net profits from operation. When the lease was made the mortgage was in default. The lessee agreed to make the lease but required Mrs. Taubel to agree that she would not evict the lessee before the expiration of the lease, which proposition she agreed to on payment to her of $4,500.00 of the fixed rent and 66 2/3 per cent of half of the net profits from the operation of the hotel, Mrs. Taubel to pay taxes which were to be paid in September, 1933.

On August 4, 1933, Mrs. Taubel, joined by her husband, exhibited her bill in the Circuit Court for Dade County to enforce the mortgage lien upon the mortgaged property. Estate Realty Corporation, Frank Geiselman, Bond & Share Corporation, Sylvia Blum and her husband, Blum, and Tavern Investment Company were made defendants. Bond & Share Corporation was made a defendant because it held

a judgment against Estate Realty Corporation in the sum of $175.00. The execution had been levied on the hotel property and it was being advertised for sale under the execution.

It was alleged that the Estate Realty Corporation was insolvent; it had failed to make necessary repairs and was permitting the property to deteriorate; the building leaked and plastering was falling; that the mortgagee had to cause the roof to be repaired at an expense of $225.00 which the mortgagor had refused to pay; that it failed to pay taxes and that Sylvia Blum had acquired the legal title to the property from Estate Realty Corporation but had not assumed to pay the mortgage indebtedness; that the deed was dated in July, 1933, and was in form a warranty deed and duly recorded.

The bill prayed for a receiver to take charge of the property and to rent it to the best advantage and to apply the proceeds therefrom to the necessary upkeep of the property, the payment of taxes, insurance and court costs and the excess to payment on the debt due to complainant. No deficiency decree was asked for against the Estate Realty Corporation.

At the time the bill of complaint was filed the sum of $76,000.00 was alleged to be due to the complainant on account of principal, and several thousand dollars for interest, approximating a total of $80,000.00.

When the mortgage was executed, E. Scott McKnight was president of the Estate Realty Corporation. When the property was conveyed to Sylvia Blum in June, 1933, J. R. Humphries was president of the corporation and McKnight vice-president and acting secretary. The deed bore the required documentary and internal revenue stamps.

On August 5, 1933, the court appointed R. H. Gardner

as receiver. The amount of bond required of him was $5,000.00, which he executed and approved. No notice of the application was given to Sylvia Blum as she was a non-resident of the State and her exact place of residence was unknown, but notice was given to Tavern Investment Company, lessee in possession, and evidence was heard in behalf of both complainant and Tavern Investment Company.

The complainants were also required to execute a bond in the sum of $2,000.00 conditioned to pay all damages which the defendants or either of them might sustain as a result of the receivership in the event the "final decree of the court" should be reversed by the Supreme Court.

The receiver was directed to take possession of the property and manage, operate and control it.

The Bond & Share Corporation on motion of the complainant was dismissed as a party defendant a month later. The reason for the dismissal of that corporation as a defendant was that the Estate Realty Corporation had paid the debt due to the Bond & Share Corporation after the commencement of the proceedings to foreclose.

The Estate Realty Corporation and Sylvia Blum, on August 31, 1933, moved the court to vacate the order appointing the receiver. The substance of the grounds upon which the motion was made is that the Tavern Investment Company is a corporation composed of Albert Rausen and members of his family and the lease to that company was the result of a conspiracy between that company and the complainants, the purpose of which was to obtain the appointment of a receiver and then to obtain a lease from the receiver for the "sum of $3,600.00 a year net"; that the lease from the Estate Realty Corporation to the Tavern Investment Company was made with the consent of the complainant who guaranteed peaceful possession of the

property thereunder and received from the Estate Realty Corporation the $5,000.00 which the Tavern Investment Company paid under its terms and agreed to "extend the balance remaining to the following year"; that in March, 1933, the Estate Realty Corporation and Sylvia Blum were negotiating with the complainant to "rewrite the mortgage on the basis of $60,000.00 of which $20,000.00 was to be paid in cash and the balance to be paid over a term of years," but pending those negotiations the "president of the Estate Realty Corporation became involved in some criminal difficulty by reason of which he was compelled to leave the State." It is alleged that the negotiations were thereupon "held in abeyance pending the determination between the parties of their status."

It is averred that the Tavern Investment Company "negotiated with the complainant direct" and as defendants believe "made an agreement with the complainant to purchase the mortgage and the defendants aver upon information and belief that the Tavern Investment Company is the real complainant in the cause"; that the Tavern Investment Company "fraudulently violated and breached its lease with the Estate Realty Corporation by hindering its profits with false entries in its books of accounts" to the end that the defendant would thereby be unable to pay the complainant enough on account of the mortgage to satisfy her, thereby "creating a condition of default on the extension agreement so that they, the said Tavern Investment Company and Rausen or his agents, could step in and buy in the mortgage and oust the defendants, Estate Realty Corporation." It is alleged that the right of possession of Sylvia Blum to the property depends upon the right of possession of the Estate Realty Corporation.

The motion attempts to set up a fraudulent and collusive

arrangement between the complainants and the Tavern Investment Company to bring about a foreclosure of the mortgage to the injury of the mortgagor and its vendee in violation of the agreements under the lease by the mortgagor to the Tavern Investment Company. It is alleged that but for that conspiracy the Estate Realty Corporation could have complied with the agreement with the complainants and operating the property itself would have derived sufficient income to satisfy the complainant.

The motion denied that the property had deteriorated in value. It alleged that it was worth considerably more than the mortgage and that the repairs were made by the lessee Tavern Investment Company to make it appear that grounds existed for a receivership, all of which was in furtherance of its conspiracy with the complainant. The movant offered to put the property in good repair and to pay for the work already done, and denied the insolvency of the mortgagor corporation.

An amendment to the motion alleged that the receivership was granted without notice to any of the parties and challenged the sufficiency of the allegations of the bill to justify the appointment of a receiver under the provisions of the Chancery Act. It was asserted in the motion, which was by way of a conclusion, that the defendants were deprived of "substantive" rights in that in the event an appeal is taken from the order and a supersedeas the effect would be to leave the property in the hands of a receiver, whereas the defendants should be permitted to retain possession of it.

The two defendants, Estate Realty Corporation and Sylvia Blum, about a month later interposed an answer to the bill. Mr. E. Scott McKnight, as vice-president, signed for the corporation. It admitted that Sylvia Blum was married, admitted the existence of the debt to Anna Taubel and the

execution of the mortgage; disclaimed any knowledge of the complainant's election to declare the entire debt due and agreement to pay solicitor's fees; averred the lease to have been made with A. Rausen on May ____, 1932, and attached an undersigned copy of a lease to that person as an exhibit, and averred that at such time the agreement was made with complainant to extend the payment of the mortgage "until such time as the defendant Estate Realty Corporation could arrange to refinance the building, negotiations for which were then going on and notice of which the mortgagor then had," and approved the same. It averred that under such agreement the mortgagee agreed to apply the proceeds of the lease to the payment of taxes and insurance, the surplus to be applied on interest and principal of the debt; that the Estate Realty Corporation received none of the proceeds from the rent but the same were paid over to S. Grover Morrow as agent and attorney for the mortgagee, Mrs. Taubel; that under the terms of that lease and agreement the lessee and lessor Estate Realty Corporation would divide the net profits from the operation of the property, the lessor's portion to be turned over to the mortgagee.

That lease was evidently the same one which has heretofore been referred to herein as having been made four years after the execution of the mortgage. No reference to that lease was made in the bill of complaint, however, although the Tavern Investment Company, the actual tenant, was made a defendant. The answer avers that pursuant to a fraudulent design to create in the mortgagee a desire to foreclose the mortgage the "lessee" diverted the profits of the lease, withheld them from the lessor and mortgagee, and that "said fraud was permitted for the purposes" stated.

It is also alleged that when the "session of 1932-1933 was over" the "lessee and mortgagee conspired to oust the de-

fendant Estate Realty Corporation of the use and possession of the said property and entered into an agreement whereby the mortgagee agreed to foreclose the property and sell the same to lessee, although he had agreed for a valuable consideration not to do so" and had accepted and received such consideration and consented to approve the lease. That averment constituted the ground for the assertion that the transaction was fraudulent and made to deprive the Estate Realty Corporation of its right to the possession of the property, and rendered the suit premature.

It is averred that the deed from Estate Realty Corporation to Sylvia Blum was in the "nature of a lien upon the interest of the Estate Realty Corporation in the property" to protect Mrs. Blum, with whom the Estate Realty Corporation was negotiating, in the matter of refinancing the Corporation. So it is averred that the instrument was a mortgage in fact. It was asserted that the complainant was estopped from beginning proceedings to enforce the mortgage lien by reason of the lease, her approval of it and receipt of rentals under it, also by reason of the conspiracy of the complainant and Tavern Investment Company to divert the proceeds from the operation of the property so as to impair the mortgagor's ability to make payments upon the debt and afford an excuse for the mortgagee to begin proceedings.

The answer prayed that the order appointing a receiver be vacated and that the defendant and its lessee be restored to their rightful possession of the property. The answer also contained a motion to strike certain portions of the bill of complaint. It was objected that the first sentence in paragraph 7 of the bill constituted a statement of a legal conclusion and was argumentative and irrelevant. That sentence contained the allegation that the complainant

paid the taxes referred to in the preceding paragraph to protect the property from tax sale, and that the 1932 taxes were paid while the property was being advertised for tax sale; that the mortgagor had failed to pay the taxes.

The entire paragraph 10 was attacked also. That paragraph alleged that because the property had deteriorated in value the failure by the mortgagor to pay taxes, insurance and make necessary repairs the security had become greatly impaired; that a receiver was necessary to take charge of the property and preserve it and rent it to the best advantage of all parties and apply the revenue derived from the rental to the upkeep of the premises, to the payment of taxes, insurance, court costs and attorney's fees and apply the remainder to the debt. It was also alleged that the Estate Realty Corporation, knowing itself to be insolvent, that the property was not worth the amount of the mortgage indebtedness and that a foreclosure suit was imminent, caused the property to be conveyed on July 26, 1933, to Sylvia Blum by warranty deed; that the deed had a United States documentary stamp of 50 cents upon it, thereby indicating that only a nominal consideration was given for the property, and that a person acting for her had stated that she gave a small consideration for the property expecting either to hold up the mortgagee for a large sum of money in "lieu of the mortgagee foreclosing or of going into possession with the avowed purpose of milking the property pending litigation"; that she expected in the event of the appointment of a receiver to post a supersedeas bond and "milk the property over the coming season" and that an agent of Sylvia Blum has offered to lease the property for the period of one year for $6,000.00 which sum is insufficient to pay interest on the debt, taxes and insurance premiums, thereby

clearly indicating that she did not intend to pay the mortgage debt.

There was an attack on the first sentence in paragraph 11 of the bill. That sentence described the character of the property involved as a ninety-six-room hotel located on Meridian Avenue in Miami Beach, and alleged that a receiver, if appointed, could make in time for the approaching season the necessary repairs to enable him to make an advantageous loan.

A *pro confesso* decree was entered against the Tavern Investment Company on October 2, 1933, and on the 13th day of that month the chancellor entered an order denying the motion to set aside the appointment of the receiver. That order was made after notice and testimony taken on the motion on three days. The chancellor recited in the order that many witnesses were produced on behalf of the defendants and complainants and a full opportunity was given all parties to be heard and that the court also considered the answer interposed by the defendants Estate Realty Corporation and Sylvia Blum.

A motion for an order of reference was made on the 16th day of October by the complainants. The motion to strike parts of the bill was denied except as to part of the sentence in paragraph 11 in which it was alleged that if a receiver was appointed he would be enabled to make necessary repairs to enable him to make an advantageous lease for the coming season. That much of the sentence was stricken from the bill.

That defendants petitioned the court for a rehearing, the ground being that the agreement between the Tavern Investment Company and mortgagee whereby the lessee agreed to purchase the property from the mortgagee inured to the benefit of the defendants Estate Realty Corporation and Sylvia Blum because of the fiduciary relationship between

them which would have enabled them to avail themselves of the privilege of paying the mortgagee the amount of cash required under the terms of the contract and executed a new mortgage for the balance, but the chancellor had declined to hear evidence that the Tavern Investment Company had such an agreement with the complainant. It was also contended that assuming the existence of the contract and the fiduciary relation between the lessee Tavern Investment Company and owner Estate Realty Corporation, that a "serious doubt of the right of the mortgagee to foreclose arises," which also cast doubt upon the propriety of the appointment of a receiver in the case.

Then on October 30th the Estate Realty Corporation and Sylvia Blum interposed a cross bill in which A. M. Liebling was joined as complainant. He, so it is alleged, in the cross bill, is the father of Sylvia Blum whom he persuaded sometime after July 10, 1933, when he arrived in Miami, to lend to the Estate Realty Corporation "certain moneys with which to pay off a certain judgment then owned by Bond & Share Corporation against said Humphreys and against Estate Realty corporation jointly and for other purposes; that to secure the said Sylvia Blum for the advances so made a deed was executed by said Estate Realty Corporation to the said Sylvia Blum." It is alleged that the deed was duly recorded but was never intended to pass title to said property but was executed for the purpose of security in the manner aforesaid."

It may be noted at this point that the deed was dated in June, 1933, before A. M. Liebling, according to the cross-bill, arrived in Miami and obtained any information about the alleged agreement between the lessee and the mortgagee and before he "procured his daughter Sylvia Blum to afterwards lend said Estate Realty Corporation certain moneys."

The deed was in form of a warranty deed of conveyance to the property by the same description as contained in the mortgage. The name of the corporation was affixed by J. R. Humphreys, president, and attested by E. S. Mc-Knight, vice-president, and seal attached. J. R. Humphreys, as president, acknowledged execution of the deed in Essex County, Massachusetts, in June, 1933, and by E. S. Mc-Knight in Dade County on July 24, 1933, on which day it was recorded.

The debt to the Bond & Share Corporation was not paid when the foreclosure proceedings were started on August 4, 1933. The debt was not paid until after the suit was commenced and the Bond & Share Corporation was not discharged as a defendant until September 5, 1933. This apparent discrepancy is explained in the cross bill by allegations to the effect that in March, 1933, J. H. Humphreys, president of Estate Realty Corporation, mortgagor, owner and lessor of the premises to Tavern Investment Company, entered into negotiations with the Taubels for a scaling down of the mortgage indebtedness to $60,000.00 of which $20,000.00 were to be paid in cash and the remaining $40,000.00 to be paid over a term of years. That was alleged on information and belief.

Before anything of a definite nature was done toward the completion of those negotiations, Humphreys, "during the spring of 1933," left Miami in an automobile with two women passengers who afterward were "found dead in some waterway near Daytona Beach." Humphreys was bound for Massachusetts and proceeded on his way. Although no criminal charge has been preferred against him in "connection with the alleged death of said women, nevertheless the said Humphreys apparently had some fear of trouble

in that regard because he did not thereafter return to Miami."

So nothing ever came of the alleged scaling down of the mortgage negotiations.

Now, Aaron Rauzin, Sr., and Albert Rauzin, Jr., officers of the lessee company, "finding out that the assignee of said mortgage was willing to scale down and that the said Humphreys had gotten mixed up in the manner aforesaid," undertook to purchase the property, or "to have the same foreclosed and procure title to said premises, thus freezing out the owner and lessor as aforesaid and all the stockholders thereof," so it is alleged.

Now, all the stockholders thereof were Humphreys and E. S. McKnight. The lessor company, Estate Realty Corporation, was organized with a capital stock of $100,000.00, "but only $33,000.00 par value was ever issued, of which $30,000.00 was issued to the said Humphreys, its president, and $3,000.00 to E. S. McKnight, its vice-president." At some point in those hectic times for the lessor company, between early or late Spring, 1933, and July 10, 1933, when A. M. Liebling arrived in Miami, Humphreys, the absconding president who remained away from the scene where his company was about to be extinguished by a foreclosure proceeding because of some squeamish scruple about appearing too soon in the neighborhood of a recent possible double murder of two women with whom he had recently left for a distant State, was "prevailed upon to assign his stock in said lessor company in blank and had forwarded the same to said Attorney S. Grover Morrow, together with a deed made out to be executed by said lessor company already signed by said Humphreys as president of said lessor company but with the grantee left blank with instructions to said Morrow to get the said McKnight to complete the

execution so as to transfer title to said hotel property to whomever might be designated by said *lessee* as the grantee to be named in said deed."

Somewhere in the cross-bill, S. Grover Morrow is alleged to be the agent or attorney of Estate Realty Corporation, but who employed him, and when, does not appear, except that in May, 1932, he wrote to the Taubels about the proposed lease of the property to the Tavern Investment Company. His services as attorney for the lessor after the Humphreys escapade in the Spring of 1933, a year later, is left to inference.

Now who "prevailed" on Humphreys, then in Massachusetts, to assign his stock in blank and execute a deed in blank to the hotel property does not appear. In any event, he appears to have been willing to divest himself of all interest in the company without consideration—it does not appear that he received any from any source—rather than return to Florida. McKnight, however, who owned three shares of stock in an insolvent corporation, was not willing to submit to a freezing out process "in any such manner," so he "invoked the aid of Liebling to save the property and his interest therein." That supplication of the distressed McKnight occurred after July 10, 1933, when Liebling arrived in Miami; how long afterward is not alleged.

The cross bill is a lengthy document consisting of about twenty-eight pages of typewritten matter, including affidavits of McKnight and Liebling and an exhibit consisting of a copy of an information against Liebling charging him with the criminal offense of perjury in the foreclosure proceeding. According to the cross bill that information which was duly signed and sworn to by the County Solicitor for Dade County and filed October 14, 1933, in the criminal court of record, was another feature of the alleged con-

spiracy and was dealt with at considerable length in the cross bill.

It was alleged that Albert Rauzin, Jr., an officer of the Tavern Investment Company, and Sam Simonhoff, one of the attorneys for the complainants and acting for it with malicious intent to injure Liebling "in his good name and reputation" and to "bring him into disrepute among his many friends and acquaintances in the City of Miami and Miami Beach, and in order to cause him great humiliation and suffering in mind and body, did cause an information to be issued by Fred Pine, County Solicitor in and for Dade County, out of the Criminal Court of Record of said county, charging the said cross-complainant Liebling with perjury in the matter of having given said answer to said inquiry in said hearing before the said judge as aforesaid."

The affidavit of Mr. Pine, County Solicitor, affirms that the information is based "upon facts that have been sworn to as true, and which if true, would constitute the offense as charged."

No facts are alleged to show how Albert Rauzin and Sam Simonhoff obtained and held such an influence over the County Solicitor as to procure his aid in participating to the extent of exerting the power of his official position in the alleged conspiracy. The inference is left to be drawn that they made the affidavits on which the information rested and that those affidavits were false and consequently the affiants themselves were guilty of perjury. The bill, however, does not allege that the affidavits were false nor does Liebling deny the truth of the charge. Rauzin and Simonhoff again exerted their influence upon county officials, so the cross bill alleges, by causing a deputy sheriff to arrest Liebling about "one o'clock A. M., Sunday, October 15, 1933," and take him to jail.

Liebling alleges that he suffered great damages by reason of the "outrageous treatment" and is entitled to have actual and vindicative damages assessed against the cross defendants in this cause, which damages, upon being so found" he is willing to assign and turn over to "Estate Realty Corporation for credit upon the contract so procured by said lessee corporation with said assignee of said mortgage as aforesaid."

It is also alleged that before the criminal charge incident Liebling was assaulted in the Admiral Hotel by Aaron Rauzin, Sr., and his two sons, one of whom was Albert Rauzin, and that such assault was another phase of the alleged conspiracy.

The cross bill is drawn with many words of descriptive quality around an alleged trust relation existing between Anna Taubel and her husband on one side and the Estate Realty Corporation and Tavern Investment Company on the other growing out of the lease which Estate Realty Corporation made to A. Rauzin in May, 1932, for a term of one year with the option of a refusal for an additional year, to which agreement the complainants agreed on condition that the cash consideration of $5,000.00 to be paid for the lease be paid to the complainants together with 50 per cent of the profits from operating the hotel and that the "lessee fulfills all the terms, conditions and covenants" set forth in the lease then the complainant would not "molest or evict" the Tavern Investment Company "from said property between said date and August 31, 1933."

Now the terms of the lease required the lessee to pay for "gas, oil, electricity, water, telephone, upkeep of lawns and shrubbery and all other charges pertaining to the operation of the hotel"; to be responsible for any and all repairs to said property, plumbing and fixtures where the said damage

was in any way caused by the fault or negligence of the said lessee"; that it would exercise reasonable care of the premises and equipment; that it would keep a complete set of books and records in connection with the operation of the hotel, including all receipts and disbursements; that the books and records shall be open to the lessor or its authorized officers at all times and a statement of receipts and disbursements shall be made up and delivered by the lessee to the lessor on the 1st and 15th day of each and every month during the term of the lease. There were other covenants which it is unnecessary here to mention.

The cross bill alleges that the complainants by agreeing to the lease waived all defaults which have occurred to that time in the lessor's mortgage obligations to the complainants and permitted "such defaults to at least remain in suspense during the term of said lease, that is to say, until August 31, 1933."

It is alleged that the complainant received the $5,000.00 paid by the lessee; that the mortgagee Taubel "received no other money on account of the 50% profits contemplated by said lease" for the reason that the Tavern Investment Company was "operated by Aaron Rauzin, Sr., and Albert Rauzin, Jr., and other members of their family, at high salaries and in such manner as to prevent the books kept by them from showing any profits to be paid to the lessor as provided for in said lease or in turn to be paid to the assignee of said mortgage."

That condition would seem to have been the concern of the lessor, the Estate Realty Corporation, because the mortgagee could certainly depend upon reasonable diligence on the part of the lessor in the matter of requiring the lessee to make its semi-monthly statements of its operations of the property according to the terms of the lease.

The mortgagee's alleged part in any supposed conspiracy to "freeze out" the lessor and Sylvia Blum is attempted to be established by the following language of the cross bill:

"That at the time this foreclosure suit was instituted there was no default in the payment of taxes of which said assignee of said mortgage could complain, because said assignee and her said husband had by their said letter of May 24, 1932, agreed to pay the taxes out of the moneys received from said lease. That as to repairs and bills incurred in connection therewith, the said lessee assumed, without any demand upon and without any consent of said lessor Company, to make extensive repairs to said hotel property, greater even than were needed, and used net profits resulting from the operation of said hotel to that end in a much larger amount than necessary, instead of paying fifty per cent. of such net profits to said lessor, or to said assignee of said mortgage for the benefit of the lessor, pursuant to the terms of said lease and the correspondence aforesaid concerning the same. That the repairs so made by said lessee on its own account were so extensive that when said lessee and its officers procured from said assignee of said mortgage a contract of purchase, as hereinafter set forth, the said assignee of said mortgage was prevailed upon to make a substantial allowance to said lessee for repairs and betterments so made; whereas the moneys expended for such repairs were moneys that belonged to said lessor under the 50% net profit provision of said lease. That if said 50% of the net profits had been duly and properly paid to said lessor it would have been in funds with which to pay off the small judgment of about $200.00 complained of in said original bill of complaint. That at the time said foreclosure suit was instituted there existed no default on the part of the mortgagor lessor which

had not been waived by the assignee of said mortgage. Nevertheless, the said assignee of said mortgage and her said husband permitted themselves to be roped into the fraudulent devices and schemes of said lessee and its officers "as hereinafter set forth, which resulted in a premature institution of foreclosure suit, on, to-wit, the 5th day of August, A. D. 1933, long before the expiration of said lease. That by reason of the matters and things above set forth, the said assignee of said mortgage had no right to foreclose at the time bill of foreclosure was filed in said cause, and in consequence, no right to the appointment of a receiver."

There was nothing in that course of conduct inconsistent with perfect good faith on the part of the complainants.

Other allegations of the cross bill relate to the alleged negotiations of Humphreys in March, 1933, with the complainants to "scale down" the mortgage debt and the alleged details of that proposition which never materialized, and Humphreys' alleged connection with or fear that he might be charged with criminal participation in the death of the two women with whom he left Miami Beach in an automobile presumably for Massachusetts, and the discovery by Aaron and Albert Rauzin of the alleged negotiations and their desire to purchase the property or "to have the same foreclosed and to procure the title to said premises," and Liebling's arrival in Miami on July 10, 1933, and his activities, and Humphreys' assignment of his stock and the execution by him of a deed to the hotel property in blank, and McKnight's alleged protest about being "frozen out" in such manner, and Liebling paying "a price" for Humphreys' stock in the Estate Realty Corporation satisfactory to him, and Liebling's subsequent activities in endeavoring to get the complainants to "scale down" the debt, which never

resulted in any agreement because he was advised by a Mr. Cassman in New Jersey that the complainants had already agreed to sell the property to the Tavern Investment Company in the event of foreclosure and the purchase of the property by complainants.

The cross bill alleges on information and belief that the Tavern Investment Company employed Simonhoff. & Simonhoff, attorneys, to foreclose the mortgage pursuant to the agreement of that company with the complainants to purchase the property. It is alleged that because of the "fiduciary relation between the lessee Tavern Investment Company and Estate Realty Corporation" the latter is entitled to the benefit of the agreement.

If that were true, it does not appear how or in what manner it would constitute a defense to the foreclosure proceedings even if the Estate Realty Corporation had not parted with the title to all the property.

On November 6, 1933, Anna Taubel and her husband answered the cross bill. It is averred that Simonhoff & Simonhoff are the solicitors for complainant. It denies that complainants agreed to sell the property to the lessee on procuring title to the property as a result of foreclosure or that the lessee Tavern Company is in reality the complainant in the proceedings or that the foreclosure was the result of a conspiracy to oust the Estate Realty Corporation.

It admitted the lease and their consent to it and agreement not to molest or evict the tenant from the hotel property before August 31, 1933, provided the tenant corporation fulfilled the terms and conditions of the lease. It is averred that in June, 1933, the lessee paid to the lessor $500.00 under the 50% division of profit clause in the lease and agreed to vacate the premises on or before August 1, 1933; that the complainant's agreement not to evict the

Tavern Investment Company was made for the benefit of that company and not for the protection of the lessor and there was no agreement not to disturb the lessor during the term of the lease. The answer denies that the complainants Taubel bound themselves not to foreclose the mortgage or that they waived all defaults in payment of interest and principal.

The answer denied that complainants agreed to pay the taxes of 1932 out of proceeds from the rent of the place to the Tavern Investment Company. The complainants denied all conspiracy charged and denied that they were "roped into any fraudulent device and scheme of said lessee" and it averred that complainants had full right to institute the foreclosure proceedings. They denied any agreement with the Estate Realty Corporation to scale down the debt.

It is averred that in June, 1933, there was an agreement between the Taubels and the Estate Realty Corporation under which the complainants were to pay to the Corporation seven hundred dollars out of which the Corporation would pay several small judgments and debts approximating two hundred and fifty dollars, for which the Corporation would execute a deed in blank by the President and return to S. Grover Morrow, who at that time was attorney for the Taubels, and to whom was also turned over corporate resolutions authorizing the conveyance and assignments of all the shares of stock of the Corporation outstanding, but that the Estate Realty Corporation violated its agreement, refused to go through with the deal and "turned over said deed and said papers to A. M. Liebling." It is averred that the deed of conveyance was intended to vest the title to the property in Sylvia Blum and that the allegation that it was intended to be a lien only to secure a debt "was an

afterthought on the part of the cross complainants in order to meet the exigencies of the suit."

The allegation that the suit to foreclose was maintained by the lessee was denied. It also denied the existence or knowledge on their part of a fiduciary relation between the lessor and lessee, or that they made themselves a party to any fraudulent scheme or device, but avers that Anna Taubel is the sole owner of the mortgage.

The answer denies all knowledge of or participation in the arrest of Liebling and denies any notice by the lessee of a desire to hold the property for another year and denies that such matters have any relation to the suit.

The answer then sets up a detailed account of the negotiation between the complainants and Estate Realty Corporation for the conveyance to the complainants of the hotel property; that the negotiations proceeded to the point where a settlement was made between the Estate Realty Corporation and its lessee of all rents due under the lease for the sum of five hundred dollars which was delivered to S. Grover Morrow, attorney for complainants, and as a part of the settlement the Tavern Company agreed to vacate the premises and deliver possession to complainants who had agreed to accept a conveyance from the Estate Realty Corporation in cancellation of the mortgage; McKnight agreed to the settlement, as an officer of the Company lessor; that under advice of counsel the title was to be taken in the name of Elizabeth R. Zeegler of New Jersey; that the negotiations progressed to the middle of July, 1933, when the same were delayed and obstructed by McKnight, who at the same time was "treacherously and fraudulently conniving with A. M. Liebling to turn over the deed and share of stock to him, and, as a result of this treachery and fraudulent connivance, he, the said McKnight, and the said A. M. Liebling induced

the said Humphreys, President of the Estate Realty Corporation, to instruct S. Grover Morrow to turn over all papers held by S. Grover Morrow to the said McKnight and to breach the agreement existing between Estate Realty Corporation and the mortgagee to convey the property to the mortgagee or her nominee."

Liebling then purchased the stock of McKnight and obtained the deed which had been signed by Humphreys to be delivered to complainants or their nominee; that Liebling took the property with full knowledge of the agreement then in existence between the Estate Realty Corporation and the complainants for conveyance of the property to them.

The answer contained both a demurrer to the cross bill and a motion to strike paragraphs XI and XII of the cross bill and paragraph VI of the prayer. Paragraphs XI and XII relate to the prosecution of Liebling for perjury, his arrest and humiliation and subsequent release and damages suffered and to the previous assault upon him by Aaron Rauzin and his two sons in the Admiral Hotel.

Sam Simonhoff also answered the cross bill denying that he was engaged by the lessee corporation to conduct the foreclosure proceedings and denying that the arrest of Liebling was part of any conspiracy between the lessee and complainants to acquire title to the property and "freeze out" the lessor corporation. He also moved to dismiss the cross bill on many grounds and to strike paragraphs XI and XII of the cross bill.

The Tavern Investment Company by their solicitors, Leo Rosin and Vincent Giblin, answered the cross bill. Possession of the property under the lease was admitted, also the hearing which was had by the Court on the 7th, 9th and 12th days of October, and that certain testimony was taken and proofs submitted. The answer denied that Mor-

row acted as attorney for the lessor in securing the consent of the complainants to the lease as alleged in the cross bill, but averred that he acted for the complainant in the transaction. It admitted the terms of the agreement by which the Taubels consented to the lease as alleged by them—denied that the Tavern Company was operated by Rauzin and others at high salaries and all alleged improper and fraudulent conduct of the lessee. The answer also denied the making of a contract between the lessee and the complainant for the purchase of the property or that the lessee employed counsel to bring the foreclosure proceedings.

It denied the existence of a fiduciary relation between the lessee and lessor and denied all improper and illegal activities in relation to the arrest of Liebling on the criminal charge of perjury. It admitted that in July, 1933, the lessee notified the lessor that it desired to exercise the option of holding the property another year and that it did not pay to the lessor any sum of money on September 1, 1933, that on that date the Receiver was in possession and therefore the Estate Realty Corporation was not able to or in a position to keep and retain the Tavern Investment Company as its tenant.

There was incorporated in the answer a motion to dismiss the cross bill—and challenged its equity.

Upon the suggestion of Roland Granat and Thomas B. Adams, attorneys for the cross complainants, Hon. Worth W. Trammell, Judge of the Circuit Court, recused himself on the ground that his name appeared on the back of the information in the case against Liebling charged with perjury and that Albert Rauzin is also a witness for the State and is President of the Tavern Investment Company charged in the cross bill with "having colluded with the assignee of the mortgage in question."

On November 14, 1933, the cross complainants interposed a pleading termed an "Amended Cross Bill." It recited that it was filed by leave of court and for the purpose of conforming to the facts developed during the first two days of the final hearing. It is not an "amended cross bill," but an amendment to the cross bill. It consists of about thirty pages of typewritten matter. It is longer than the cross bill, including exhibits. The purpose of the amendment seems to have been to emphasize the alleged fiduciary relation supposed to exist between the lessor Estate Realty Corporation and the lessee Tavern Investment Company and the fraud or bad faith alleged to have been perpetrated by the latter in endeavoring to secure a contract with the complainant for the purchase of the hotel property.

There are many allegations of fact contained in the amendment to the cross bill which are deemed by the pleader to establish the fiduciary relation and the breach of it by the lessee and to couple the complainant with both lessor and lessee in such relation so that alleged breaches of good faith by the latter become chargeable to the complainant in conscience so as to affect her status in the suit as being without clean hands when she began it. The agreement of settlement between all the parties made in June, 1933, or about that date under which in lieu of an accounting by the lessee of profits under the lease it would pay $500 and vacate the premises on August 1, 1933, instead of August 31, 1933, is referred to as a "pretended compromise."

It is alleged that the Taubel connection with the lease agreement precludes them from using the defaults of which the lessor mortgagor was guilty in the payment of interest and principal on the debt and breaches of other covenants as a ground for the foreclosure proceeding.

There are many allegations about repairs and payment of

taxes which as to the first were alleged to have been made by the lessee with complainant's consent and as to the latter that no taxes were due when the suit was brought. The alleged transaction, about "scaling down" the mortgage debt is repeated and amplified in that its related incidents are repeated in greater detail. A. M. Liebling's activities are again repeated in detail with some expansions and slight variations. The history of the lessee company is gone into at some length. It is made to appear by the allegations in that particular that the Tavern Investment Company is a "mere paper shell" corporation, organized to avoid personal liability and is dominated by Albert Rauzin and used as an *alter ego* in the transaction of his private business. Relating to the agreement which the complainants made with "Admiral Hotel, Inc.," a Florida corporation, the amendment proceeds at great length to recite the history of the transaction alleging it to be part of the general scheme to defraud the lessor and its successor, Liebling. New names are brought into this story of the transaction.

The story of Liebling's prosecution for perjury or the accusation against him on that charge is dealt with again at great length.

The examination of all this lengthy pleading in the case by us fails to impress us with the necessity for such extended treatment of the case by the parties. The Taubels answered the "Amended Cross Bill." It averred that the testimony of October 7th, 9th and 12th offered by the defendants showed that a settlement had been made between the Estate Realty Corporation and Tavern Investment Company on June 9, 1933, under which the tenant agreed to vacate the property on August the first. That settlement was attempted to be impeached in the amendment to the cross bill.

The answer denied all fraud and collusion with the lessee and denied the effect of the complainant's participation in the lease to be as alleged in the cross bill and amendment.

It is averred that the complainants merely sought by that arrangement to help the Tavern Investment Company and for its benefit only.

It denied any agreement with the lessor to scale down the mortgage debt. It averred in full the details of the transaction in which the Estate Realty Corporation agreed to convey the land to complainant for a consideration of seven hundred dollars, but that the corporation violated the agreement and conveyed the property to Sylvia Blum. It admitted an agreement to sell the land in the event the complainants became the purchaser of it to the Admiral Hotel, Inc., but denied any knowledge until two weeks after the suit was begun that Albert Rauzin or anyone connected with that family was interested in it.

The answer disclaimed any knowledge of or participation in the Liebling criminal proceedings. The answer concluded with a motion to dismiss the amended cross bill.

Sam Simonhoff also answered the amended cross bill, as did the Tavern Investment Company, Albert Rauzin, Morris Rubin and Ida, his wife, Alex Goldstein, M. Rauzin, Leo Rosen and Admiral Hotel, Inc.

Simonhoff adopted all the averments of his answer to the cross bill and the others also moved to dismiss the cross bill.

In November, 1933, the case came on for final hearing on all the pleading and motions referred to in this statement and the testimony taken before the court on the 10th, 11th and 15th days of November, 1933.

The court decreed that the decrees *pro confesso* thereto entered be confirmed. The petition for rehearing on the

motion to vacate the order appointing the Receiver was denied. Motion to strike portions of the cross bill and amended cross bill as made by complainants and Simonhoff were denied.

That the equities in the case were with the original complainants. The relief prayed by cross complainants was denied and the cross bill was dismissed.

The complainants' mortgage was decreed to be a lien superior in dignity to all others on the property. The amount of debt adjudged to be due was $82,469.27. The Receiver was required to pay over to complainants the money in his possession. The property was ordered to be sold to pay the debt found to be due and complainant, Anna Taubel, was permitted to bid at the sale for the property. The court retained jurisdiction of the case until all questions arising in it should be settled. Hon. Paul D. Barns made the decree.

The following day the Estate Realty Corporation, Sylvia Blum and A. M. Liebling entered their appeal from the order appointing the Receiver of August 5th; the order of October 13th denying the motion to vacate the order appointing the Receiver, and from the final decree. The appeal was made returnable February 5, 1934.

On November 24, 1933, the appellants applied to this Court for a constitutional writ under Section 5 of Article V of the Constitution. The purpose was to stay the sale of the property under the final decree pending a decision of the cause on its merits and the vacation of the order appointing the Receiver.

This Court allowed the writ insofar as the sale of the property was stayed, but the writ should not in any wise interfere with the possession of the property by the Receiver.

The case was orally argued and submitted on the merits. The first volume of the transcript was submitted on the application for the writ. The other two volumes of the transcript were filed later.

This lengthy statement seems necessary in order that it might be shown how the controversy arose, the apparent complications in which it was involved, and the many persons whose activities in one way or another were claimed to affect the rights of the complainant to the relief sought by her original bill to enforce the lien of the mortgage.

In many respects it is a most extraordinary case, not because of the amount involved, which in itself is considerable, but because of the great importance or significance which Mrs. Blum and A. M. Liebling, who are the real parties in interest on the part of the defendants, apparently seek to give certain conversations, letters, transactions and agreements in which the complainants took part in person or through their counsel which are supposed to affect their right to the relief sought in the bill to foreclose the mortgage.

The case has taken a wide range and a very large record was built around incidents which have little or no bearing upon the subject for adjudication.

Incidents occurring after the bill was filed and the suit was commenced are set out in the pleadings at great length and dealt with in the testimony taken in the vain effort to impress them with a sinister significance as evidence of a conspiracy existing between the complainant and the Tavern Investment Company to defraud or as expressed in the pleading to "freeze out" the Estate Realty Corporation and deprive it of the benefits which it claimed through its lessee, the Tavern Investment Company, on account of alleged agreements between it and the complainants for a

scaling down of the mortgage debt and sale of the property to the lessee or its nominee in the event the complainant became the purchaser of the property under the final decree.

The initial or central point of the defendants' defense lies if it exists at all in the lease made by the Estate Realty Corporation to the Tavern Investment Company in May, 1932, for a term of one year to expire August 31, 1933. The answer of the defendant Realty Corporation filed October 2, 1933, avers that the lease was made to A. Rauzin and an unsigned copy of it is attached to the answer as an exhibit and made a part of the answer. That exhibit shows the lease to have been made to A. Rauzin. The cross bill filed by the Estate Realty Corporation and Sylvia Blum on October 30, 1933, alleges that the lease was made to "Tavern Investment Company, a corporation." The letter of William and Anna Taubel of May 10, 1932, incoporated in the cross bill was addressed to Tavern Investment Company, Miami Beach, Florida. In that letter the writers referred to the lease "which you have executed or are about to execute on the Admiral Hotel, 1020 Meridian Avenue, Miami Beach, Florida," and stated, "I hereby agree not to molest or evict you from said property between said date and August 31, 1933; provided you fulfill all the terms, conditions and covenants as set forth in said lease." That letter it is alleged was delivered by the Taubels to the Tavern Investment Company about June 3, 1932, after the letter of William Taubel to S. Grover Morrow, attorney or agent for the Estate Realty Corporation, owner and lessor, in which Taubel stated that we will sign the lease on the following conditions: "Total amount of lease is five thousand, we are to receive fifteen hundred signing the lease and to receive one thousand cash September 1, 1932. We

will pay the taxes out of this payment. We want seven fifty out of one thousand on January 1, 1933, which leaves them two fifty. Out of fifteen hundred February 1, 1933, we want twelve fifty, which leaves them two fifty, a total of five hundred which they will receive out of the $5,000. If we receive more than five hundred out of the fifty-fifty proposition we will pay them five hundred."

Continuing he stated, "If this is satisfactory we will sign the lease. If they accept this kindly send me copy of same."

The word "they" refers to the Estate Realty Corporation. The "fifty-fifty proposition" refers to the clause in the lease that the "lessor and lessee are to divide the net profits derived from the operation of the hotel on a basis of 50% to the lessor and 50% to the lessee." The defendants contend that that clause bound the Tavern Investment Company to the Estate Realty Corporation in a fiduciary relation, which precluded the Tavern Company from making any agreement with the owners of the mortgage which would impair the lessor's chances for receiving a profit on the operation of the hotel, and the complainant's consent to the terms of the lease made them a third party to the relation. That may all be assumed to be true. Yet in the absence of any agreement between the complainants and the Tavern Investment Company to breach the "fifty-fifty" clause of the lease, by misappropriation of funds, or extravagant and wasteful policies and suppression of information as to the operation of the business or by any means not contemplated by the terms of the lease which would result in depriving the lessor company of a revenue from the operation of the hotel this defendant would have no equity to urge against the foreclosure proceeding on that score.

The final decree was made on the merits. All the pleadings and the testimony were before the chancellor. His finding that the equities were with the complainant necessarily involved a finding that no conduct of the complainants identified them with any unlawful or inequitable purpose of the Tavern Investment Company, or its alleged officers or owners to mismanage the hotel and waste its income either upon its agents, servants or officers or in unnecessary and extravagant repairs to the end that the lessor might be deprived of its share of the profits. With that finding we entirely agree. Certainly we are unable to say that appellant has made it clearly to appear that the chancellor's finding in that regard was erroneous. See Mock v. Thompson, 58 Fla. 477, 50 Sou. Rep. 673; Lucas v. Wade, 43 Fla. 419, 31 Sou. Rep. 231; Brickell v. Town of Ft. Lauderdale, 75 Fla. 622, 78 Sou. Rep. 681; Manassee v. Dutton Bank, 75 Fla. 327, 78 Sou. Rep. 424; Smith v. O'Brien, 75 Fla. 252, 78 Sou. Rep. 13; Simpson, Trustee, v. First Nat. Bank, 74 Fla. 539, 77 Sou. Rep. 204.

Neither the chancellor who tried the case nor we of this Court find any element in the contract of August 24, 1933, under which the complainants agreed with Admiral Hotel, Inc., a Florida corporation, that complainants would bid at the foreclosure sale for the property up to $70,000 if necessary to acquire the title and in the event they should acquire it would convey it to the corporation for the sum of fifty-five thousand dollars. There is no evidence of an effort to suppress bidding; on the contrary the complainants agreed, to bid and carry that bidding to an amount in excess of which they at one time, according to the defendant's averments, were willing to scale down the debt. The amount they agreed to bid was even in excess of the reputed value of the property. In all of this there was noth-

ing of which the Estate Realty Corporation could complain. The contract inured in fact to its benefit in that one bidder was at least secured thereby who was willing to pay a large price.

During the argument before this Court the question was asked from the bench if the Admiral Hotel, Inc., and Albert Rauzin were identical, that is to say, if the corporation were a mere *alter ego* of Albert Rauzin. Someone answered that the complainants admitted it. Such, however, is not the case and this evidence does not establish such a fact. But even if it were true Albert Rauzin's relation to the Estate Realty Corporation was not such as precluded him from acquiring an interest in the property at the expiration of the lease held by Tavern Investment Company.

The Admiral Hotel, Inc., was a separate and distinct entity from the Tavern Investment Company. It was organized to purchase the hotel property if it could acquire it. To that end it obtained a contract with the complainants after the foreclosure proceedings began, by which the complainants agreed to sell the property if they acquired it at the master's sale. The evidence is not sufficient to impugn that transaction at the instance of Liebling and Mrs. Blum and the Estate Realty Corporation or to entitle them to its benefits.

We are also of the opinion that the warranty deed from Estate Realty Corporation to Sylvia Blum was at the time of its execution intended to be a conveyance of the title. It was an absolute conveyance in form. It was originally prepared as for a conveyance of the legal title to the complainants when there were negotiations between the complainants and the Estate Realty Corporation for a transfer of the property and cancellation of the mortgage. Those negotiations failed through no fault of the complainants,

but through the vacillating conduct of one of the officers of the corporation who assumed to act in the absence of the President, who was unwilling at that time to return to Florida.

It appears that the activities of A. M. Liebling at that time on his arrival in Florida contributed also to the breaking up of this settlement.

A careful examination by us of the merits of the case as exhibited by all the evidence introduced confirms the presumption in favor of the chancellor's finding. The procedural questions discussed in the brief are in the light of the evidence on review of the case on its merits of secondary importance.

We are of the opinion therefore that the chancellor's final decree was without error, and the same is hereby affirmed.

DAVIS, C. J., and WHITFIELD and BUFORD, J. J., concur.